[No. S124179. Aug. 1, 2005.]

B. BIRGIT KOEBKE et al., Plaintiffs and Appellants, v.
BERNARDO HEIGHTS COUNTRY CLUB, Defendant and Respondent.

830

COUNSEL

Lambda Legal Defense and Education Fund, John W. Davidson; and H. Paul Kondrick for Plaintiffs and Appellants.

Christine Sun, Alan Schlosser, Peter Eliasberg, Jordan C. Budd; James D. Esseks, Romana Mancini; Miranda D. Junowicz, Steven C. Sheinberg, Michelle Deutchman; Geoff Kors; Maxie Rheinheimer Stephens & Vrevich and Darin L. Wessel for American Civil Liberties Union of Northern California, American Civil Liberties Union of Southern California, American Civil Liberties Union of San Diego and Imperial Counties, American Civil Liberties Union Foundation Lesbian and Gay Rights Project, the Anti-Defamation League, Equality California and Tom Homann Law Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Nancy Hogshead-Makar; Nancy M. Solomon; Shannon Minter and Courtney Joslin for Women's Sports Foundation, California Women's Law Center and National Center for Lesbian Rights as Amici Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Tom Greene, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, and Antonette Benita Cordero, Deputy Attorney General as Amici Curie on behalf of Plaintiffs and Appellants.

Morrison & Foerster, John R. Shiner, Rick Bergstrom, John Sobieski, Michael Katz; Horvitz & Levy, Frederic D. Cohen, Patricia Lofton and Jeremy B. Rosen for Defendant and Respondent.

## OPINION

**MORENO, J.—** ■ Plaintiffs, a lesbian couple who are registered domestic partners, sued defendant country club, to which one of them belongs, alleging that the club's refusal to extend to them certain benefits it extends to married members of the club constitutes marital status discrimination under Civil Code section 51, familiarly known as the Unruh Civil Rights Act (the Act). The club obtained summary judgment on plaintiffs' marital status discrimination claim and the Court of Appeal affirmed. We granted review to determine whether the Act prohibits discrimination based on marital status. We conclude that marital status claims are cognizable under the Unruh Civil Rights Act, but, for purposes of such claims, a distinction exists between registered domestic partners (see Fam. Code, § 297 et seq.) and other unmarried couples and individuals. Domestic partners registered under the California Domestic Partner Rights and Responsibilities Act of 2003 (the Domestic Partner Act), the current version of the domestic partnership law, are the equivalent of spouses for the purposes of the Act and a business that extends benefits to spouses it denies to registered domestic partners engages in impermissible marital status discrimination. Therefore, we reverse summary judgment in favor of defendant to the extent plaintiffs' claim implicates the Domestic Partner Act.

■ While the Act may also protect the rights of other unmarried couples and unmarried individuals to equal access to public accommodations under some circumstances, distinctions drawn by businesses between married couples and such unmarried couples and individuals that are supported by legitimate business reasons do not constitute impermissible marital status discrimination under the Act. Applying this principle, we reject plaintiffs' claim that the country club's spousal benefit policy constituted impermissible

marital status discrimination on its face prior to the effective date of the Domestic Partner Act. As explained below, during this period of time, the country club's policy was supported by legitimate business interests. In this connection, we also reject plaintiffs' alternative claim that the policy facially violated the Unruh Civil Rights Act's proscription against sexual orientation discrimination. However, we agree with the Court of Appeal that under the facts disclosed by the record plaintiffs may have a viable Unruh Civil Rights Act claim for discriminatory application of the club's policy.

## I. FACTS

Plaintiffs B. Birgit Koebke and Kendall E. French sued defendant Bernardo Heights Country Club (BHCC) alleging, among other causes of action, that BHCC discriminated against them on the basis of sex, sexual orientation, and marital status in violation of the Unruh Act. BHCC obtained summary judgment and, with respect to most of the claims, the Court of Appeal affirmed. We granted plaintiffs' petition for review. "Because plaintiff[s] appeal[] from an order granting summary judgment, we must independently examine the record to determine whether triable issues of material fact exist. [Citations.]" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) In conducting de novo review "we must view the evidence in a light favorable to plaintiff[s] as the losing party [citation], liberally construing [their] evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff[s'] favor." (*Id.* at p. 768.) We apply this standard to the evidence submitted in connection with the motion below.

Plaintiffs are lesbians who have been in a relationship since 1993. They are also avid golfers. Koebke is a member of BHCC, having purchased a membership in 1987 for $18,000. BHCC's facilities include a golf course, clubhouse and dining room. The purpose of BHCC is "to promote golf and recreational activities, social activities, and maintain a country club with facilities for the entertainment and amusement of its members and their guests." BHCC has seven membership categories, including "Regular" or equity members who collectively own the club.[1] Each of the 350 Regular members has an equal ownership interest in all of the real property and other assets of BHCC, and is liable to it for capital and operational assessments as well as dues and other charges. BHCC's Regular members are entitled to play golf at BHCC as often as they wish without paying any additional fees. Plaintiff Koebke is a Regular member.

---

[1] All members except "Social" members are entitled to all of BHCC's privileges and activities; Social members may participate in BHCC's social activities but not its golfing activities.

Pursuant to its bylaws, BHCC's membership benefits in each of the seven membership categories are also extended "to member's [*sic*] legal spouse and unmarried sons and daughters under the age of twenty-two (22) residing with them." Thus, Regular members may golf with their spouses and any qualifying child on an unlimited basis and without paying additional membership or usage fees. By contrast, other individuals with whom members wish to play are designated as "guests" under BHCC's rules and regulations. Guests are not permitted to play more than six times in any one year, and no more than once every month, and must pay a green fee each time they play at BHCC. Guests are required to register each time they play golf and are not allowed to sign charge slips for food at the club. The registration requirement does not apply to spouses of members and, unlike guests, they may sign charge slips for food.

In addition to the spousal benefits granted its married members, BHCC's bylaws also permit a membership to be transferred upon a member's death to his or her surviving spouse or son or daughter without any transfer fee, provided that the survivor is accepted for membership. By contrast, an unmarried member's membership, and all his or her property rights in BHCC, terminate upon that member's death.

According to Koebke, in 1995, after she began her relationship with French, she asked BHCC's board of directors (the Board) to permit her to designate French as her "significant other" to enable them to golf together on the same basis as married couples. The Board rejected the request and "decided to continue its present policy that non-married significant others would have no privileges at the Club."

In August 1998, plaintiffs executed a written "Statement of Domestic Partnership," in which each stated that she considered the other to be "her primary life companion and spouse, sharing with one another the joys and difficulties encountered during their life together." At some point, plaintiffs also registered as domestic partners with the state and with the City of San Diego.[2]

According to her deposition, in 1998 Koebke again appeared before the Board and asked that it adopt a "significant other" policy. The matter was referred to the membership committee. Koebke was informed by letter that the "committee [was] absolutely opposed to the recognition of a 'significant

---

[2] In a letter to BHCC's Board of Directors in November 2000, plaintiffs stated they had "filed domestic partnership" with the state and attached a copy of the filing. The filing itself is not in the record. There is no information in the record about when plaintiffs registered as domestic partners with the City of San Diego or about the scope of the city's domestic partner ordinance.

other' and recommend[ed] against modification of the rules to provide for a 'special guest.'" The Board adopted the committee's recommendation and rejected Koebke's request.

In November 2000, Koebke and French wrote a joint letter to BHCC's Board in which they asked the Board to extend BHCC's spousal benefit rights to French. In the letter, the women explained: "Our dilemma is that we cannot legally marry to satisfy the current criteria to play as a couple at Bernardo Heights . . . giving the true benefits of [Koebke's] family membership. We feel that our case is unique and isolated, in that other 'single' members of the club do have the option to marry." They stated that they considered themselves married and set forth the various legal steps they had taken to formalize their relationship, including "[f]il[ing] domestic partnership in the state of California that recognizes each other as legal spouses," and attached a copy of the filing. The Board rejected the request in a letter to Koebke from the Board's president, H. Gregory Meeks. Meeks wrote: "There is no provision in the Bylaws for a non-spousal partner to have any of the benefits of membership and the Board of Directors may not unilaterally change the Bylaws. Mr. Monson [BHCC's attorney] stated the procedure for amending the Bylaws by petition and vote of the membership, which you are free to pursue although you indicated that you do not wish to pursue this path." He suggested that French apply for her own membership.

In the trial court, Koebke cited instances in which, while rejecting her requests to extend its family benefits to include French, BHCC allegedly granted those benefits to the partners or friends of some of its heterosexual members. For example, even before Michael Wexler married his wife, Joni, they were extended family benefits. Joni Wexler told Koebke that BHCC knew she and Michael Wexler were not married at that time. The nongolfing female partner of another member, Jeff O'Conner, was allowed full social privileges at BHCC, and her daughter golfed with O'Conner even though she was not O'Conner's daughter. O'Conner made no secret of the fact he was not married to his partner and was not the father of her daughter. Koebke also claimed that Elizabeth Burkholder, a professional golfer, was allowed to play with her "coach/manager/friend" without assessing her green fees for him, an arrangement confirmed by BHCC's minutes. According to Koebke, another member, Larry Simon, played golf with a nonmember neighbor who he apparently represented was his son, although BHCC members knew they were not related. Additionally, the minor grandchildren of members were allowed to play with members on an unlimited basis and without fees, despite the absence of any provision in BHCC's bylaws allowing for this. Furthermore, BHCC allowed the adult children and grandchildren of members to play up to 14 times a year, instead of the six specified in the bylaws, and at reduced green fees. BHCC also allowed the Rancho Bernardo High School boys golf team to play free of charge. Finally, according to Jeff O'Conner's

declaration, after Koebke commenced her litigation against BHCC, BHCC's general manager, Buzz Colton, told O'Conner that there were other unmarried heterosexual couples who were allowed to play at BHCC and that Koebke had not yet "found that out."

In 2001, Koebke received a letter from Thomas Monson, BHCC's attorney and a BHCC member, that stated: "The board of directors recognizes the State of California's strong public policy favoring marriage and believes that BHCC supports that policy as a family oriented organization." Koebke claimed that this was the first time she had ever heard BHCC express endorsement of the public policy favoring marriage or assert that it was a "family-oriented organization" defined in a way that excluded her and French. Jeff O'Conner also stated that at no time during the interview process in which he became a member of BHCC was he told that BHCC recognized a strong public policy favoring marriage because it was a "family-oriented organization." O'Conner, who was not married to his female partner, would not have become a member of BHCC had this been disclosed to him. In her deposition, Koebke stated that the Board's denial of spousal benefits to French was motivated by its fear that if it did so "it would open the flood gates [sic]" to homosexuals and BHCC would become known as "gay friendly," which a member of the Board communicated to her was not "a desire or direction of the Club."

Koebke stated that she also encountered hostility both before and after she filed suit against BHCC from BHCC members as a result of her attempts to have spousal benefits extended to her partner. Her sexual orientation became a subject of speculation and discussion among BHCC members. One BHCC member, Judy Stillman, overheard another member say that perhaps the men in his group "should get [the plaintiffs] to put on a skit to show us how they do it with toys, and charge an admission price, to help pay for the lawsuit." A similar comment was overheard by BHCC member O'Conner. Koebke said she was also told that the only way she could utilize BHCC's spousal benefit was to marry a man. BHCC also required her to register French whenever she played at BHCC in a registration book that did not exist until shortly after Koebke and French filed their lawsuit. Additionally, Koebke became the target of what she believed were baseless complaints at BHCC over alleged infractions of club rules, like the club's dress code.

Plaintiffs' second amended complaint, which is the basis of the current proceeding, was filed on October 12, 2001. The first cause of action alleged that BHCC had discriminated against plaintiffs on the basis of sex, sexual orientation, and marital status in violation of the Act. Additional causes of action alleged violation of the San Diego Municipal Code's ban on sexual orientation discrimination, discriminatory restrictions on ownership or use of

real property instruments in violation of Civil Code section 53, fraud, and misrepresentation. Plaintiffs sought damages, punitive damages, and injunctive and declaratory relief.

Defendant answered and filed a motion for summary judgment or, alternatively, summary adjudication. Defendant's motion was granted. Without specifically addressing plaintiffs' claims of discrimination under either the Act or the San Diego Municipal Code, the trial court found that "Defendant did not provide different privileges to plaintiffs than to other unmarried couples." Judgment was entered in defendant's favor.

The Court of Appeal found that plaintiffs had failed to establish an Unruh Civil Rights Act violation on the basis of marital status discrimination, gender discrimination, or sexual orientation discrimination. However, the Court of Appeal also concluded that there was a triable issue of material fact as to whether BHCC had discriminatorily enforced its spousal benefit policy. Therefore, the Court of Appeal reversed the summary judgment to the extent that it rejected plaintiffs' claim that BHCC's bylaws were applied in a discriminatory manner but, in all other respects, affirmed the judgment.

We granted plaintiffs' petition for review.

## II. DISCUSSION

### A. *Introduction*

Plaintiffs contend that the Unruh Civil Rights Act prohibits a business from treating married and unmarried couples unequally and, therefore, defendant is engaging in a continuing violation of the Act by extending certain benefits to married couples that it denies to unmarried couples. Plaintiffs seek both statutory damages and injunctive relief. (Civ. Code, § 52 [setting forth damages for violation of the Act]; *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28, fn. 5 [219 Cal.Rptr. 133, 707 P.2d 195] [recognizing the availability of injunctive relief for a violation of the Act].)

■ For at least some of the period in which plaintiffs allege this violation has occurred, they have been registered with the state as domestic partners. Although plaintiffs maintain that their claim of marital status discrimination under the Act is not dependent on their domestic partner status, their claim for injunctive relief requires us to examine the law currently in effect. (*White v. Davis* (1975) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222].) As we explain, in the current version of the domestic partnership law, the Legislature has made clear its intention to substantially equalize the status of registered domestic partners and spouses. Therefore, we first examine

whether, in light of the current version of the domestic partnership law, the Act requires businesses to treat registered domestic partners the same as spouses. We conclude that under current law, plaintiffs must be treated the same as spouses for purposes of the Act.

Plaintiffs maintain they are also entitled to damages, including damages for the period prior to the effective date of the current domestic partnership law. Therefore, it becomes necessary to determine whether BHCC's denial of the spousal benefit to plaintiffs constituted impermissible marital status discrimination during this earlier period of time. We conclude that BHCC's policy did not, on its face, constitute either impermissible marital discrimination or sexual orientation discrimination under the Act. But we agree with the Court of Appeal that plaintiffs presented sufficient evidence of discriminatory application of that policy to proceed to trial on a discriminatory application theory.

B. *Under Unruh Civil Rights Act, Treating a Domestic Partner Registered Under the Domestic Partner Act Differently Than a Spouse Constitutes Impermissible Marital Status Discrimination.*

Plaintiffs' claim for injunctive relief requires us to apply the law currently in effect. (*White v. Davis, supra,* 13 Cal.3d at p. 773, fn. 8 [" 'Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court' "], quoting *American Fruit Growers v. Parker* (1943) 22 Cal.2d 513, 515 [140 P.2d 23].) We must determine, therefore, whether BHCC currently violates the Act by denying plaintiffs, who are registered as domestic partners, the same benefits it extends to married couples.

1. *The Domestic Partner Act*

The current version of the domestic partnership statutes, denominated by the Legislature the California Domestic Partner Rights and Responsibilities Act of 2003 became effective January 1, 2005. (Stats. 2003, ch. 421, § 2.)[3] The Domestic Partner Act permits same-sex couples and some opposite-sex couples in which one or both individuals are over the age of 62, who share a common residence, to file a "Declaration of Domestic Partnership" with the Secretary of State. (§ 297.)

Section 297.5 grants domestic partners "the same rights, protections, and benefits" and imposes upon them "the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative

---

[3] All further statutory references, unless otherwise specified, are to the Family Code.

regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses." (§ 297.5, subd. (a).) These rights and responsibilities are extended to current domestic partners, former domestic partners and surviving domestic partners. (§ 297.5, subds. (a)–(c).)

The purpose of the Domestic Partner Act is set forth in uncodified portions of section 297.5, in which the Legislature declares: "This act is intended to help California move closer to fulfilling the promises of inalienable rights, liberty, and equality contained in Sections 1 and 7 of Article 1 of the California Constitution by providing all caring and committed couples, regardless of their gender or sexual orientation, the opportunity to obtain essential rights, protections, and benefits and to assume corresponding responsibilities, obligations, and duties and to further the state's interests in promoting stable and lasting family relationships, and protecting Californians from the economic and social consequences of abandonment, separation, the death of loved ones, and other life crises." (Stats. 2003, ch. 421, § 1, subd. (a).) The Legislature has found "that despite longstanding social and economic discrimination, many lesbian, gay, and bisexual Californians have formed lasting, committed, and caring relationships with persons of the same sex," and that "[e]xpanding the rights and creating responsibilities of registered domestic partners would further California's interests in promoting family relationships and protecting family members during life crises, and would reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution." (Stats. 2003, ch. 421, § 1, subd. (b).)

■ Section 15 of the Domestic Partner Act, furthermore, requires that the act be "construed liberally in order to secure to eligible couples who register as domestic partners the full range of legal rights, protections and benefits, as well as all of the responsibilities, obligations, and duties to each other, to their children, to third parties and to the state, as the laws of California extend to and impose upon spouses." (Stats. 2003, ch. 421, § 15.)

Section 297.5 effectuates the legislative intent by using the broadest terms possible to grant to, and impose upon, registered domestic partners the same rights and responsibilities as spouses in specified areas of laws whether they are current, former or surviving domestic partners. For example, pursuant to section 297.5, subdivision (c), a "surviving registered domestic partner, [upon] the death of the other partner," is granted all the same rights and is subject to all the same responsibilities, from whatever source in the law, as those "granted to and imposed upon a widow or a widower." Similarly, section 297.5, subdivision (d) states: "The rights and obligations of registered domestic partners with respect to a child of either of them shall be the same

as those of spouses. The rights and obligations of former or surviving registered domestic partners with respect to a child of either of them shall be the same as those of former or surviving spouses." Subdivision (e) requires that, "[t]o the extent that provisions of California law adopt, refer to, or rely upon . . . federal law" and that this reliance on federal law would require domestic partners to be treated differently than spouses, "registered domestic partners shall be treated by California law as if federal law recognized a domestic partnership in the same manner as California law." (§ 297.5, subd. (e).)

With respect to discrimination, subdivision (f) provides: "Registered domestic partners shall have the same rights regarding nondiscrimination as those provided to spouses." (§ 297.5, subd. (f).) Moreover, with one exception pertaining to eligibility for long-term care plans, subdivision (h) prohibits any public agency in California from discriminating against "any person or couple on the ground that the person is a registered domestic partner rather than a spouse or that the couple [consists of] registered domestic partners rather than spouses." (§ 297.5, subd. (h).)

It is clear from both the language of section 297.5 and the Legislature's explicit statements of intent that a chief goal of the Domestic Partner Act is to equalize the status of registered domestic partners and married couples. It is in light of this intent that we must determine whether the Unruh Act precludes BHCC from granting married couples benefits it denies to persons registered as domestic partners under the Domestic Partner Act. We conclude that the Act does.

### 2. *The Unruh Civil Rights Act*

Civil Code section 51, subdivision (b) states: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Enacted in 1959, the Unruh Civil Rights Act amended an 1897 version of Civil Code section 51 that was declarative of a common law doctrine requiring places of public accommodation "to serve all customers on reasonable terms without discrimination and . . . to provide the kind of product or service reasonably to be expected from their economic role." (*In re Cox* (1970) 3 Cal.3d 205, 212 [90 Cal.Rptr. 24, 474 P.2d 992] (*Cox*).)

Seminal decisions of this court construing the scope of the Act concluded that its protections were not confined to the enumerated categories in the statute but that these categories were "illustrative rather than restrictive." (*Cox, supra,* 3 Cal.3d at p. 216 [the Act prohibits a business from

excluding a customer because of his association with another person of unconventional appearance]; *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 735 [180 Cal.Rptr. 496, 640 P.2d 115] [the Act prohibits an apartment owner from refusing to rent an apartment to a family with a minor child]; *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320] [the Act prohibits a condominium development from restricting residence to persons over 18].) We also concluded that in enacting the Unruh Civil Rights Act, the Legislature intended to ban *all* forms of arbitrary discrimination in public accommodations. (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 75 [219 Cal.Rptr. 150, 707 P.2d 212] ["The Act is this state's bulwark against arbitrary discrimination in places of public accommodation"].)

We revisited these conclusions in *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873] (*Harris*). In the process of doing so, we created a three-part analytic framework for determining whether a future claim of discrimination, involving a category not enumerated in the statute or added by prior judicial construction, should be cognizable under the Act.

*Harris* involved a claim by women receiving public assistance that a landlord's policy requiring prospective tenants to have gross monthly incomes equal to or greater than three times the rent charged for an apartment (the minimum income policy) constituted economic status discrimination and was barred by the Unruh Civil Rights Act. The plaintiffs argued that the defendant's policy excluded persons who could pay the rent but were unable to meet the minimum income policy. They maintained they were entitled to a trial to determine whether the policy constituted arbitrary discrimination under the Act. (*Harris, supra,* 52 Cal.3d at p. 1154.) We held that the Act did not include within its ambit claims of economic status discrimination because economic status is fundamentally different than the categories either enumerated in the Act or added by judicial construction.

In reaching this conclusion, we affirmed the principle articulated in our earlier decisions that the Act's enumerated categories are illustrative, rather than restrictive. "Beginning with *Cox* in 1970, the Unruh Act has been construed to apply to several classifications not expressed in the statute. [Citations.] [¶] We generally presume the Legislature is aware of appellate court decisions. [Citations.] It has not taken specific action to overrule these cases. Moreover, the Legislature has amended the Act several times in the 20-year period since *Cox* [citation] was decided." (*Harris, supra,* 52 Cal.3d at pp. 1155–1156.)

However, our examination of the legislative response to our prior decisions led us to conclude that the Legislature had not acquiesced in the

broad proposition set forth in those decisions that the Act was intended to ban all forms of arbitrary discrimination. "Notwithstanding our language about 'arbitrary discrimination' and 'stereotypes,' the Legislature has continued to pay close attention to the specified categories of discrimination in the Unruh Act. . . . Thus, the Legislature's continued emphasis on the specified categories of discrimination in the Act (without adding the words 'arbitrary,' 'unreasonable,' or similar language to its provisions) reflects the continued importance of those categories in its proper interpretation." (*Harris, supra,* 52 Cal.3d at pp. 1158–1159.)

Having therefore concluded that the Act's ban on arbitrary discrimination was qualified by the continued importance of the enumerated categories, we considered whether the Act could, nonetheless, be extended to claims of economic status discrimination "in light of both the language and history of the Act and the probable impact on its enforcement of the competing interpretations urged on us by the parties." (*Harris, supra,* 52 Cal.3d at p. 1159.)

We devised a three-part analysis to answer this question. First, in reviewing the statutory language, we discerned an essential difference between economic status and both the Act's enumerated categories and those added by judicial construction. We found that their common element was that they "involve personal as opposed to economic characteristics—a person's geographical origin, physical attributes, and personal beliefs." (*Harris, supra,* 52 Cal.3d at p. 1160.) Thus, the first prong of the *Harris* inquiry is whether a new claim of discrimination under the Act is based on a classification that involves personal characteristics.

Second, we asked in *Harris* whether a legitimate business interest justified the minimum income policy. We found it did. "The minimum income policy is no different in its purpose or effect from stated price or payment terms. Like those terms, it seeks to obtain for a business establishment the benefit of its bargain with the consumer: full payment of the price. In pursuit of the object of securing payment, a landlord has a legitimate and direct economic interest in the income level of prospective tenants, as opposed to their sex, race, religion, or other personal beliefs or characteristics." (*Harris, supra,* 52 Cal.3d at p. 1163.)

Third, we considered the potential consequences of allowing claims for economic status discrimination to proceed under the Act. We perceived "two significant adverse consequences that would likely follow from plaintiffs' proposed interpretation of the Act." (*Harris, supra,* 52 Cal.3d at p. 1166.) First, we believed it would involve courts "in a multitude of microeconomic decisions we are ill equipped to make" regarding the reasonableness of the criteria used by landlords to screen tenants unable to pay their

rent regularly and on time throughout the tenancy. (*Ibid.*) Second, permitting prospective tenants to challenge such criteria on a case-by-case basis might induce landlords to abandon such neutral criteria as income, applicable to all prospective tenants regardless of their personal characteristics, and use subjective criteria that might "disguise and thereby promote the very kinds of invidious discrimination based on race, sex, and other personal traits that the Unruh Act prohibits." (*Id.* at p. 1169.) Therefore we concluded that the minimum income policy did not violate the Act. (*Ibid.*)

3. *Application of the Harris Analysis to Plaintiffs' Marital Status Discrimination Claim*

Both plaintiffs and BHCC rely on the analytic framework set forth in *Harris* to determine whether plaintiffs' marital status discrimination claim is cognizable under the Act.[4] We now consider each of *Harris*'s three prongs on this issue.

a. *Does Marital Status Involve Personal Characteristics*

As to the first prong of the *Harris* analysis, plaintiffs contend that marital status involves a personal characteristic like those categories already covered by the Act. BHCC, however, contends that marital status is nothing more than a legal status conferred by the state that does not involve personal characteristics. We agree with plaintiffs.

We did not define the phrase "personal characteristic" in *Harris*, but we indicated that, at minimum, it encompassed both the categories enumerated in the Act and those categories added to the Act by judicial construction. (*Harris, supra,* 52 Cal.3d at pp. 1160–1161.) Thus, the list would include "sex, race, color, religion, ancestry, national origin, disability, or medical condition" (Civ. Code, § 51, subds. (b), (c)), and unconventional dress or appearance, family status and sexual orientation (*Harris, supra,* at p. 1161) but not "financial status or capability." (*Ibid.*) What those categories have in common is not immutability, since some are, while others are not, but that they represent traits, conditions, decisions, or choices fundamental to a

---

[4] BHCC contends that because plaintiffs are domestic partners, they have not alleged marital status discrimination under the Act. The premise of this argument is that marital status discrimination refers only to differences in treatment of married couples vis-a-vis unmarried individuals. We disagree. A business that decides which benefits are to be extended to members of the public based on whether they are married necessarily discriminates against both unmarried individuals and unmarried couples. (Cf. *Smith v. Fair Employment & Housing Com.* (1992) 12 Cal.4th 1143, 1156 [51 Cal.Rptr.2d 700, 913 P.2d 909] [use of the phrase "marital status" in prohibition against discrimination in the Fair Employment and Housing Act (Gov. Code, § 12955, subds. (a), (b)) includes both unmarried individuals and unmarried couples].) Domestic partners are a subset of unmarried couples.

person's identity, beliefs and self-definition. (*Id.* at p. 1160 [unlike economic status, enumerated categories involve personal characteristics like "a person's geographical origin, physical attributes and personal beliefs"].)

Under this standard, marital status is more like the existing categories to which the Act applies than it is to economic status. The kinds of intimate relationships a person forms and the decision whether to formalize such relationships implicate deeply held personal beliefs and core values. Indeed, marriage itself is defined as "a personal relation arising out of a civil contract between a man and a woman . . . ." (§ 300.) Similarly, the decision whether to enter into a domestic partnership is motivated by personal values and beliefs. This point was recognized by the Legislature in its characterization of these relationships in the Domestic Partner Act as "lasting, committed, and caring," and undertaken by two individuals to "share lives together, participate in their communities together, and [for] many [to] raise children and care for other dependent family members together." (Stats. 2003, ch. 421, § 1, subd. (b).)

Thus, contrary to BHCC's argument, the decision to marry or to enter into a domestic partnership is more than a change in the legal status of individuals who have entered into marriage or domestic partnership. In both cases, the consequences of the decision is the creation of a new family unit with all of its implications in terms of personal commitment as well as legal rights and obligations.

BHCC also relies on the analysis of *Harris* set forth in *Beaty v. Truck Ins. Exchange* (1992) 6 Cal.App.4th 1455 [8 Cal.Rptr.2d 593] (*Beaty*). *Beaty* is the only appellate decision that has considered whether marital status discrimination is cognizable under the Act. On the first prong issue, *Beaty* found that marital status, like the economic status involved in *Harris*, is a category that the Act was simply not intended to reach. As noted, in *Harris* we determined that economic status was fundamentally different than the categories enumerated in the Act as a reason to exclude it from coverage under the Act (*Harris*, *supra*, 52 Cal.3d at pp. 1161–1162). Similarly, in *Beaty*, the Court of Appeal concluded that the strong public policy favoring marriage categorically precluded recognition of marital status discrimination under the Act. Since *Beaty* is critical to the parties' arguments, we discuss it at some length.

*Beaty* involved a male couple. The two men had lived together for 18 years and had taken various legal steps to create a common life, including jointly owning many of their assets, among them their residence, and naming one another as each other's primary beneficiary for estate and life insurance purposes. The defendant insurer had issued them joint homeowners and

automobile insurance policies, but refused to issue them an umbrella policy for a single premium because such policies were available only to married couples. (*Beaty, supra,* 6 Cal.App.4th at p. 1458.) The plaintiffs sued, alleging that the defendant's refusal to issue the umbrella policy constituted sexual orientation and marital status discrimination in violation of the Act. Their action was dismissed after the trial court sustained the defendant's demurrer without leave to amend.

The Court of Appeal cited *Harris* for the proposition that "future expansion of prohibited categories should be carefully weighed to ensure a result consistent with legislative intent. [Citations.]" (*Beaty, supra,* 6 Cal.App.4th at p. 1462, fn. omitted.) Accordingly, the court observed: "In light of *Harris,* we decline plaintiffs' invitation . . . to include 'marital status' as an additional category of prohibited discrimination. There is a strong policy in this state in favor of marriage [citations], and in the context here presented that policy would not be furthered (and in the case of an unmarried heterosexual couple, would actually be thwarted) by including marital status among the prohibited categories. It is for the Legislature, not the courts, to determine whether nonmarital relationships such as that involved in this case 'deserve the statutory protection afforded the sanctity of the marriage union.' " (*Id.* at pp. 1462–1463.)

Unquestionably, there *is* a strong public policy favoring marriage. (*Norman v. Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 9 [192 Cal.Rptr. 134, 663 P.2d 904].) This policy serves specific interests "not based on anachronistic notions of morality. The policy favoring marriage 'is rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society.' (*Laws v. Griep* (Iowa 1983) 332 N.W.2d 339, 341.) Formally married couples are granted significant rights and bear important responsibilities toward one another which are not shared by those who cohabit without marriage." (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 275 [250 Cal.Rptr. 254, 758 P.2d 582]; see *Marvin v. Marvin* (1976) 18 Cal.3d 660, 684 [134 Cal.Rptr. 815, 557 P.2d 106] [observing that "the structure of society itself . . . depends upon the institution of marriage"].)[5]

There are also practical interests served by the policy favoring marriage. For purposes of determining entitlement to rights and benefits, a marriage

---

[5] The policy favoring marriage is an affirmative policy that fosters and promotes the marital relationship and is not incompatible with some degree of legal recognition and protection for unmarried couples and individuals. (See, e.g., *Marvin v. Marvin, supra,* 18 Cal.3d at 683–684; *Beaty, supra,* 6 Cal.App.4th at p. 1463 ["There are scores of statutes in which the Legislature has included 'marital status' in antidiscrimination legislation"].)

license provides a "readily verifiable method of proof." (*Norman v. Unemployment Ins. Appeals Bd., supra,* 34 Cal.3d at p. 10.) By contrast, a claim for such rights and benefits made by an unmarried couple presents "numerous problems of standards and difficulties of proof" regarding the depth and stability of the nonmarital relationship that create a potential for "intrusions into rights of privacy and association." (*Ibid.*; see *Elden v. Sheldon, supra,* 46 Cal.3d at pp. 275–276.) A related interest supporting the public policy of promoting marriage is to minimize the risk of third parties who provide services or benefits from loss or fraud. (*Harrod v. Pacific Southwest Airlines* (1981) 118 Cal.App.3d 155, 158 [173 Cal.Rptr. 68] [upholding denial of cause of action for wrongful death to surviving partner of unmarried couple under former Code of Civil Procedure section 377 because "an action based on a meretricious relationship presents greater problems of proof and dangers of fraudulent claims than an action by a spouse or putative spouse"].)

▪ These policy considerations cannot justify denial of Unruh Civil Rights Act protection to domestic partners, whatever their application to other unmarried individuals and couples. To couples who meet the requirements of establishing a domestic partnership under the Domestic Partner Act and who have registered under that law, the Legislature has granted legal recognition comparable to marriage both procedurally and in terms of the substantive rights and obligations granted to and imposed upon the partners, which are supported by policy considerations similar to those that favor marriage. (§ 297.5, subd. (a).) Thus, under the Domestic Partner Act, domestic partners, like "[f]ormally married couples," have been "granted significant rights and bear important responsibilities toward one another which are not shared" by couples who cohabit or who have not registered as domestic partners. (*Elden v. Sheldon, supra,* 46 Cal.3d at p. 275.)

▪ Furthermore, as explained in the next part, the practical considerations served by the policy favoring marriage are now also promoted by the Domestic Partner Act. The declaration of domestic partnership provides a readily verifiable method of proof for determining eligibility for services and benefits. Additionally, the mutual obligations undertaken by domestic partners, comparable to those of spouses, minimize any economic risk to third parties that extend such services and benefits to domestic partners. Thus, in creating domestic partnerships, the Legislature has also created a policy favoring such partnerships similar to the policy favoring marriage.

▪ Additionally, the Legislature has made it abundantly clear that an important goal of the Domestic Partner Act is to create substantial legal equality between domestic partners and spouses. As noted above, subdivision (f) of section 297.5 states: "Registered domestic partners shall have the same

rights regarding nondiscrimination as those provided to spouses." We interpret this language to mean that there shall be no discrimination in the treatment of registered domestic partners and spouses. This reading comports with the Legislature's statement that the Domestic Partnership Act "shall be construed liberally in order to secure to eligible couples who register as domestic partners *the full range of legal rights, protections and benefits*, as well as all of the responsibilities, obligations, and duties to each other, to their children, to third parties and to the state, *as the laws of California extend to and impose upon spouses.*" (Stats. 2003, ch. 421, § 15, italics added.) Of special relevance to the Unruh Civil Rights Act issue presented here, the Legislature has found that expanding the rights and obligations of domestic partners "would reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution." (Stats. 2003, ch. 421, § 1, subd. (b).)

 In light of this legislative action, we conclude that the policy favoring marriage is not served by denying registered domestic partners protection from discrimination under the Act. To the contrary, permitting a business to discriminate against registered domestic partners by denying them benefits or services it extends to spouses violates the comparable public policy favoring domestic partnership. We conclude that, consistent with the first prong of the *Harris* analysis, discrimination against registered domestic partners in favor of married couples is a type of discrimination that falls within the ambit of the Act.

### b. *Legitimate Business Interests*

As a further ground for holding that the Act did not ban marital status discrimination, *Beaty* invoked the second prong of the *Harris* analysis and found that the insurer's denial to the plaintiffs of the umbrella coverage it issued to married couples was justified by legitimate business interests. (See *Harris, supra,* 52 Cal.3d at pp. 1162–1165.) Likewise, BHCC, relying on *Beaty,* also argues that its restriction of the spousal benefit to married couples serves legitimate business interests.

In its discussion of the second prong of *Harris, Beaty* found that the "legal unity of interest and the shared responsibilities attendant upon a marriage" both minimized the economic risk to the insurer in providing such coverage to married couples and "provide[d] a fair and reasonable means of determining eligibility for services or benefits." (*Beaty, supra,* 6 Cal.App.4th at p. 1464.) By contrast, an insurer could reasonably conclude that the relationship of an unmarried couple "lacks the assurance of permanence necessary to assess with confidence the risks insured against in a joint umbrella policy." (*Ibid.*) As discussed, these same concerns have been echoed in other decisions

rejecting claims by unmarried couples to such benefits and services. (E.g., *Elden v. Sheldon, supra,* 46 Cal.3d at pp. 275–276; *Norman v. Unemployment Ins. Appeals Bd., supra,* 34 Cal.3d at p. 9; *Harrod v. Pacific Southwest Airlines, supra,* 118 Cal.App.3d at p. 158.)

■ These concerns, however, do not apply to registered domestic partners. Registered domestic partners occupy a legal status that, like marital status, is formalized, public, and verifiable. (§§ 297, 298, 298.5, 299.) The declaration of domestic partnership that registered domestic partners are required to file with the Secretary of State (§ 297, subd. (b)) provides an easily verifiable method of determining whether a couple is in a registered domestic partnership. Therefore, a business is no longer required to "undertake a 'massive intrusion' [citation] into [the couples'] private lives [and] inquire into their sexual fidelity and emotional and economic ties" (*Beaty, supra,* 6 Cal.App.4th at p. 1465) to determine whether these unions possess a sufficient assurance of permanence and legal unity of interests to extend benefits formerly reserved for spouses. Moreover, because the substantive rights and responsibilities granted to and imposed upon domestic partners are the same as those granted to and imposed upon spouses (§ 297.5), a business extending such benefits would have the same assurance against loss or fraud that it would have in the case of spouses.

In light of this analysis, we find unpersuasive the various business interests BHCC claims are served by its policy of denying family membership benefits to any but married couples. BHCC claims that extending that benefit to "members' friends" might lead to overuse of its facilities, create a disincentive for such friends to apply for membership and would discourage its "legitimate goal of creating a family-friendly environment by welcoming the immediate family of married members." French, however, is not simply Koebke's friend, but her registered domestic partner, with rights and responsibilities similar to that of a spouse. Extending the spousal benefit to her would not create the stampede on the fairway that BHCC appears to envision.

■ BHCC also argues that denying French the spousal benefit contributes to the creation of a "family-friendly environment." While creating a family-friendly environment may be a legitimate business interest, that policy is not served when a business discriminates against the domestic partner of one of its members. Rather, by so doing, the business violates the policy favoring domestic partnerships which, like the policy favoring marriage, seeks to promote and protect families as well as reduce discrimination based on gender and sexual orientation. Accordingly, we conclude that, while promoting a "family-friendly environment" may be a legitimate business interest, that interest is not furthered by excluding families formed through domestic partnership.

### c. *Consequences of Allowing Plaintiffs' Claim to Proceed*

Lastly, in rejecting marital status as a category for purposes of Unruh Civil Rights Act protection, *Beaty* applied the third prong of the *Harris* test, which inquires about "the consequences that will flow" from permitting a plaintiff to proceed with a novel Unruh Act claim. (*Harris, supra,* 52 Cal.3d at p. 1165.) *Beaty* concluded that the consequence of allowing plaintiffs to proceed with their marital status discrimination claim "would be that *all* de facto couples would be treated as a married unit" in derogation of "the strong policy in this state favoring marriage." (*Beaty, supra,* 6 Cal.App.4th at p. 1465, italics added.) In this case, however, allowing plaintiffs to proceed with their claim would not have this adverse consequence, because our ruling affects only registered domestic partners, not all unmarried couples. Moreover, the consequence of interpreting the Act to prohibit discrimination against domestic partners would have the positive effect of effectuating the Legislature's intent expressed in the Domestic Partner Act to create substantial legal equality between registered domestic partners and spouses.

### d. *BHCC's Other Arguments*

BHCC argues that section 297.5 has no impact on whether the Unruh Civil Rights Act bars discrimination against domestic partners.[6] It contends that section 297.5 extends to domestic partners only such rights and responsibilities as are granted to and imposed upon spouses and, because spouses are not protected under the Act, neither are domestic partners. This argument misses the point. As discussed, consistent with the first prong of *Harris*, discrimination against domestic partners is a type of discrimination that falls within the ambit of the Act. Nonetheless, BHCC, following *Beaty*, argues that special policy and practical considerations unique to marriage should preclude courts from interpreting the Act to prohibit discrimination that favors married couples over unmarried ones. As we have explained, these rationales do not justify discrimination between married couples and domestic partners registered under the Domestic Partner Act.

BHCC embraces the view expressed by the *Beaty* court that the inclusion of marital status in antidiscrimination statutes other than the Unruh Civil Rights Act shows that the Legislature's failure to add that category to the Act implies a legislative intent that such discrimination not be included within the Act. (*Beaty, supra,* 6 Cal.App.4th at p. 1463.) Historically, however, the scope of the Act has been determined by both legislative amendments to the statute

---

[6] In connection with these claims, BHCC asks that we take judicial notice of portions of the legislative history of section 297.5. We grant BHCC's request. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [104 Cal.Rptr.2d 377, 17 P.3d 735].) Nothing in this material, however, affects our analysis or alters our conclusions.

and judicial decisions, and the Legislature has not seen fit to continuously "update" the Act to include new forms of prohibited discrimination. (See *Harris, supra,* 52 Cal.3d at pp. 1154–1159.) Moreover, we are not concerned at this point with marital status discrimination generally but the discrimination against domestic partners outlawed by the Domestic Partner Act. The Legislature's failure to amend the Act to expressly prohibit such discrimination is a particularly weak barometer of legislative intent. (*People v. Anderson* (2002) 28 Cal.4th 767, 780 [122 Cal.Rptr.2d 587, 50 P.3d 368].) For the same reason, we also reject BHCC's related argument that, because the only specific antidiscrimination provision in section 297.5 involves discrimination against domestic partners by public agencies (§ 297.5, subd. (i)), the Legislature did not intend to ban discrimination against domestic partners in public accommodations. No specific legislative declaration is required for this court to infer from the statements of legislative intent accompanying the Domestic Partner Act an intent that registered domestic partners should not be discriminated against in favor of married couples in public accommodations.

BHCC also contends that, in order to qualify for protection under the Act, a category must involve a protected class under federal equal protection law. In a related claim, BHCC argues the enumerated categories have in common that they encompass a group broadly stigmatized by the wider society. But *Harris* did not hold that only classes protected under federal equal protection law were worthy of protection under the Act, nor did we require a history of stigmatization in order to bring a category within the ambit of the Act.

 Moreover, discrimination based on marital status implicates discrimination against homosexuals who, as the Legislature recognized in the Domestic Partner Act, have been subject to widespread discrimination. For example, in its findings with respect to section 297.5, the Legislature notes that gay, lesbian, and bisexual Californians have established "lasting, committed, and caring relationships" despite "longstanding social and economic discrimination." (Stats. 2003, ch. 421, § 1, subd. (b).) Additionally, the Legislature declared that one purpose served by expanding the rights of domestic partners is to combat such discrimination. (*Ibid.*)

Citing subdivision (c) of Civil Code section 51, BHCC also argues that its policy passes muster under the Act because it applies equally to all unmarried couples and individuals across the enumerated categories of the Act, e.g., it applies equally without regard to race, religion, nationality, gender, etc. Subdivision (c) provides: "This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry,

national origin, disability, or medical condition." A similar argument was made in *Beaty* which found that "the Unruh Act was not intended to create a right of insurance access so long as the insurer's policy is applicable alike to all persons regardless of race, color, sex, religion, etc. [Citations.]" (*Beaty, supra,* 6 Cal.App.4th at p. 1463.)[7] Because the defendant's denial of umbrella policies to unmarried couples was not based on the enumerated categories in the Act, the Court of Appeal concluded the plaintiffs had not been "singled out for arbitrary treatment." (*Beaty,* at p. 1463.)

If *Beaty* meant to suggest by this observation that only the enumerated categories in the Act can provide a basis for a claim of unlawful discrimination under the Act, the observation was inaccurate. As *Beaty* elsewhere acknowledges, in *Harris* we declined to overrule our prior decisions that "extended the Unruh Act to classifications not expressed in the statute." (*Beaty, supra,* 6 Cal.App.4th at p. 1462.) Thus, in *Harris,* we cited the statutory language relied on by *Beaty* for the limited purpose of showing that the Legislature's continued emphasis on the enumerated categories was evidence that it did not intend for the Act to ban all forms of arbitrary discrimination. (*Harris, supra,* 52 Cal.3d at pp. 1158–1159.) We did not hold that this legislative activity foreclosed judicial expansion of the Act to include new categories. We merely cautioned that the addition of new categories would have to be consistent with legislative intent. (*Ibid.*) As discussed above, extending the Act to protect registered domestic partners goes no farther than the express and implied legislative mandate against discrimination found in the Domestic Partner Act.

 We conclude that the Unruh Civil Rights Act prohibits discrimination against domestic partners registered under the Domestic Partner Act in favor of married couples. Therefore, to the extent plaintiffs' marital status discrimination claim implicates the Domestic Partner Act, BHCC is not entitled to summary judgment.

---

[7] The language currently found in subdivision (c) of Civil Code section 51 appeared in the second sentence of a prior version of section 51. (Stats. 1958, ch. 1866, § 1, p. 4424.) In *Marina Point,* we declared its meaning was "obscure." (*Marina Point, Ltd. v. Wolfson, supra,* 30 Cal.3d at p. 733.) In *Harris,* however, we deemed it significant that the Legislature had not altered or repealed that section, but continued to add categories to it (*Harris, supra,* 52 Cal.3d at pp. 1158–1159), and noted that the minimum income policy at issue applied equally to all members of the enumerated categories. We cited this as further evidence that that policy was not arbitrary for purposes of the Act. (*Id.* at p. 1169.)

C. *Prior to Enactment of the Domestic Partner Act, BHCC's Spousal Benefit Policy Did Not Constitute Either Impermissible Marital Status Discrimination or Sexual Orientation Discrimination on Its Face, but Plaintiffs May Still Seek to Prove That the Policy Violated the Unruh Act as Applied to Them.*

In addition to seeking injunctive relief, plaintiffs seek damages for violations of the Unruh Civil Rights Act "for being subject to discriminatory treatment by [BHCC] for many years prior" to the effective date of the Domestic Partner Act on January 1, 2005.[8] Therefore, we address whether, during this earlier period, BHCC's denial of the spousal benefit to plaintiffs constituted impermissible marital status discrimination under the Act. We conclude that, on its face, the policy did not violate the Act. We also address and reject plaintiffs' alternative claim that, on its face, BHCC's policy violated the Act's prohibition of sexual orientation discrimination. However, we agree with the Court of Appeal that, while BHCC's policy did not on its face constitute either marital status or sexual orientation discrimination, sufficient evidence of unequal application of the policy was adduced by plaintiffs to allow them to proceed on an unequal application theory.

As noted, *Beaty* found that the policy favoring marriage precluded recognition of marital status as a protected category under the Unruh Civil Rights Act. We need not decide whether that categorical statement is correct because even if we assume that marital status discrimination, outside the context of the Domestic Partner Act, is cognizable under the Act, such discrimination would nonetheless be permissible if justified by "legitimate business interests." (*Harris, supra,* 52 Cal.3d at p. 1162.) Applying this test to the case before us, we conclude that legitimate business interests facially justified BHCC's spousal benefit policy during the period before the effective date of the Domestic Partner Act.[9]

BHCC argues that its goal in adopting its spousal benefit policy was to strike a balance between competing concerns. BHCC wanted to attract and maintain members while preventing overutilization of its facilities. BHCC could reasonably have concluded that these goals would best be served by extending certain benefits to families created through marriage but not to unmarried couples and individuals. BHCC could also have concluded that extending spousal benefits to unmarried individual members would have led

---

[8] Whether portions of plaintiffs' claim are barred by the applicable statute of limitations for Unruh Civil Rights Act actions is not before us and we express no opinion on that subject.

[9] Since we conclude that BHCC's adoption of its spousal benefit policy was justified by legitimate business interests, we need not discuss the third *Harris* prong, the consequences of allowing plaintiffs' claim to proceed. (*Harris, supra,* 52 Cal.3d at pp. 1165–1169.)

to overutilization of its facility, created a disincentive for the friends of such members to buy their own memberships in the club, and created a constant influx of casual users of the course that may have had an adverse effect on the creation of a family-friendly environment, to the extent that that may be a legitimate business interest. Prior to the Domestic Partner Act, a marriage license presented the clearest method by which BHCC could distinguish among its members in order to extend benefits to some, but not to others, and achieve its larger goals. In this connection, BHCC was not obligated to employ other methods, such as requiring or allowing proof of cohabitation, that were arguably less reliable and more intrusive than a marriage license to ascertain the nature and stability of its unmarried members' relationships. Of course, BHCC was free to cut finer distinctions than married and unmarried, but its failure to do so, even though it may have resulted in some degree of unfairness to committed couples like plaintiffs, did not on its face constitute impermissible marital status discrimination.

Accordingly, we conclude that BHCC's spousal benefit policy for the period prior to the Domestic Partner Act did not, on its face, constitute impermissible marital discrimination under the Unruh Civil Rights Act.[10]

---

[10] Although plaintiffs were registered domestic partners under the domestic partner statutes in effect between January 1, 2000 and January 1, 2005 (see Stats. 1999, ch. 588, § 2; Stats. 2001, ch. 893, § 3), they do not base their marital status discrimination claim for this period of time on those statutes. Rather, they assert that the Act bars marital status discrimination against unmarried couples generally. Nor do plaintiffs argue that BHCC could not distinguish, in its pursuit of the legitimate business interests articulated above, between registration under significantly weaker domestic partner statutes and a marriage license. Justice Werdegar's concurring and dissenting opinion argues that it is illogical to reject BHCC's legitimate business interests as justifications for denying the spousal benefit to registered domestic partners under the Domestic Partner Act but not under prior versions of that law. We disagree. The prior versions of the domestic partner law were not comparable to the Domestic Partner Act in scope, intent, or procedure. It was, for example, much easier to terminate a domestic partnership under earlier versions of the law than it is under the Domestic Partner Act. (Compare former § 299, subd. (a) and current § 299.) Moreover, the prior versions did not grant to, or impose upon, registered domestic partners the broad range of substantive rights and responsibilities granted to and imposed upon registered domestic partners under the Domestic Partner Act. For example, the only substantive right generally granted to domestic partners registered under the 2000 version of the domestic partner law was hospital visitation rights. (Health & Saf. Code, § 1261.) Nor did the prior versions contain the explicit declaration of the Legislature's intent to equalize the status of registered domestic partners and spouses found in the current version. (Stats. 2003, ch. 421, § 1.) Thus, unlike the current expansive law, earlier versions of the domestic partner law distinguished registered domestic partners from other unmarried couples for very limited purposes and domestic partnership registration was not in itself evidence of mutual commitment and responsibility comparable to marriage. We therefore reject the concurring and dissenting opinion's contention that the existence of these earlier domestic partner statutes should alter our analysis of plaintiffs' claim for damages during this period.

Plaintiffs alternatively contend that BHCC's policy facially violated the Act's proscription against sexual orientation discrimination (*Harris, supra,* 52 Cal.3d at p. 1155), because using marriage as a criterion for allocating benefits necessarily denies such benefits to all of its homosexual members who, like plaintiffs, are unable to marry. (§ 300 ["Marriage is a personal relation arising out of a civil contract between a man and a woman . . . ."].)

■ In *Harris,* we rejected an analogous claim. The plaintiffs in *Harris* argued that, assuming economic status was not protected under the Act, the defendant's minimum income policy constituted gender discrimination because of its disparate impact on women who were more likely to be receiving public assistance and who generally had lower incomes than men. (*Harris, supra,* 52 Cal.3d at p. 1170.) We observed, however, that "the language of the Act suggests that *intentional* acts of discrimination, not disparate impact, was the object of the legislation." (*Id.* at p. 1172.) Examining the language of Civil Code section 51 we explained, "The references to 'aiding' and 'inciting' denial of access to public accommodations, to making discriminations and restrictions, and to the commission of an 'offense' imply willful, affirmative misconduct on the part of those who violate the Act. Moreover, the damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount reveals a desire to punish intentional and morally offensive conduct. In contrast, title VII of the Civil Rights Act [which allows a disparate impact analysis] does not allow recovery of compensatory or punitive damages, but confines the plaintiff to specified forms of equitable relief. [Citation.]" (*Harris, supra,* at p. 1172.) We noted further that the Act "explicitly exempts standards that are 'applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability.' ([Civ. Code,] § 51.) By its nature, an adverse impact claim challenges a standard that is applicable alike to all such persons based on the premise that, notwithstanding its universal applicability, its actual impact demands scrutiny. If the Legislature had intended to include adverse impact claims, it would have omitted or at least qualified this language in section 51." (*Id.* at pp. 1172–1173.)

■ We also observed that the plaintiffs had failed to cite any authority from any jurisdiction involving statutes comparable to the Act in which the disparate impact test had been employed. (*Harris, supra,* 52 Cal.3d at p. 1173.) Furthermore, we noted that the federal laws that applied a disparate impact test were aimed at specific forms of discrimination in employment and housing while the Act " 'aims to eliminate arbitrary discrimination in the provision of *all* business services to all persons. Adoption of the disparate impact theory to cases under the Unruh Act would expose businesses to new liability and potential court regulation of their day-to-day practices in a manner never intended by the Legislature. This we

decline to do.' " (*Harris,* at p. 1174.) We held, therefore, "that a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act. A disparate impact analysis or test does not apply to Unruh Act claims." (*Id.* at p. 1175.) Nonetheless, we acknowledged that *evidence* of disparate impact could be admitted in Unruh Civil Rights Act cases because "such evidence may be probative of intentional discrimination in some cases . . . ." (*Harris,* at p. 1175.)

Plaintiffs cast their claim as one of disparate treatment rather than disparate impact. Plaintiffs argue that, unlike disparate impact, in which the disproportionate impact of a facially neutral policy on a protected class is a substitute for discriminatory intent, their claim is that BHCC's discriminatory intent was established by its adoption of marriage as the criterion by which to extend benefits to some of its members, but not others, because gay and lesbian couples cannot marry in this state. Thus, according to plaintiffs, BHCC's adoption of the spousal benefit policy amounted to intentional sexual orientation discrimination. Plaintiffs argue that this disparate treatment theory is a recognized theory of discrimination under the Act. (See *Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 538 [30 Cal.Rptr.2d 706] ["A policy or a classification, in itself permissible, may nevertheless be illegal if it is merely a device employed to accomplish prohibited discrimination"].) Here, however, plaintiffs do not point to any evidence that BHCC adopted its spousal benefit policy to accomplish discrimination on the basis of sexual orientation. Rather, plaintiffs' argument, like disparate impact analysis, relies on the *effects* of a facially neutral policy on a particular group and would require us to infer *solely* from such effects a discriminatory intent. Accordingly, the reasons we gave for rejecting disparate impact in *Harris* would seem to apply with equal force to plaintiffs' theory. We therefore conclude that BHCC's policy did not, on its face, discriminate against plaintiffs on the basis of sexual orientation.

Nonetheless, as the Court of Appeal noted, there was evidence adduced in the summary judgment proceeding below that BHCC did not apply its facially neutral policy in an impartial manner. Rather, as the Court of Appeal observed, there was evidence that unmarried, heterosexual members of BHCC were granted membership privileges to which they were not entitled, while plaintiffs were denied such privileges purportedly pursuant to BHCC's spousal benefit policy. There was, moreover, significant evidence that BHCC's directors were motivated by animus toward plaintiffs because of their sexual orientation, including evidence of BHCC's inconsistent application of the spousal benefit policy to its unmarried, heterosexual members while, at the same time, it repeatedly rebuffed plaintiffs' efforts to modify the policy to include them. We conclude then that plaintiffs should be allowed to try to

establish that, prior to 2005, BHCC's spousal benefit policy was discriminatorily applied in violation of the Act. (See *Everett v. Superior Court* (2002) 104 Cal.App.4th 388 [128 Cal.Rptr.2d 418] [reversing summary judgment where the plaintiffs presented evidence sufficient to support an inference that amusement park's facially neutral cutting-in-line policy was discriminatory as applied against African-Americans].)

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the Court of Appeal in part, affirm it in part, and remand the case for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting—I concur in the majority's conclusion that because the Unruh Civil Rights Act (Civ. Code, § 51) prohibits discrimination against registered domestic partners on the basis of their marital status and plaintiffs are registered domestic partners under the Domestic Partner Rights and Responsibilities Act of 2003 (Stats. 2003, ch. 421, § 2), defendant Bernardo Heights Country Club (BHCC) is not entitled to summary judgment on plaintiffs' claim for injunctive relief against marital status discrimination. (Maj. opn., *ante*, pt. II.B.) I respectfully disagree, however, with the majority's conclusion that "legitimate business interests facially justified BHCC's spousal benefit policy" (maj. opn., *ante*, at p. 851) *before* January 1, 2005, the effective date of the current act. As the majority concedes (*id.* at p.852, fn. 10), plaintiffs have presented evidence that they were registered as domestic partners under the partnership statutes in effect between January 1, 2000, and January 1, 2005. The business interests the majority cites as justifying the earlier discrimination are the same interests BHCC posits and the majority *rejects* as justifying BHCC's current discrimination. In my view, those business interests went no further in justifying discrimination against domestic partners registered under the previous act than they do now.

In its brief on the merits, BHCC posited the following business justifications for its spousal benefit policy: (1) to restrict access in order to ensure availability of tee times, avoid slow play, and preserve the golf course's condition; (2) to attract new members and discourage "free riding" guests from playing repeatedly without joining; and (3) to help create a "family-friendly environment." I agree that restricting access, attracting members, and maintaining a congenial atmosphere for families are legitimate goals for a country club. But in light of this court's holding that those interests do not justify discrimination against domestic partners registered under the current

act, BHCC, in my view, cannot demonstrate, as a matter of law on the summary judgment record, that these goals justified discriminating against couples in registered domestic partnerships in the 2000–2004 period.

First, with regard to access, BHCC reasonably declines to "extend unlimited golfing privileges to members' friends." But to provide club privileges to registered domestic partners would not have been equivalent to opening the club to unlimited use by members' friends: even under California's first domestic partnership statute, effective January 1, 2000, partners were far more than "friends." Under that law (Stats. 1999, ch. 588, § 2), partners were defined as "two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring." (Fam. Code, former § 297, subd. (a).)[11] A partnership could be formed only by jointly filing a notarized declaration and form with the Secretary of State (former § 298), in which the partners stated they shared a residence and "agree[d] to be jointly responsible for each other's basic living expenses incurred during the domestic partnership" (former § 297, subd. (b)(2)). The Secretary of State kept a registry of partnerships and provided the partners with a copy of the registered form. (Former § 298.5, subd. (b).) A person could not register in a partnership if married, could have only one partner at a time, and could not register a new partnership for six months after formally dissolving the old one. (Former §§ 297, 298.5, 299.)

A country club member might have dozens of golfing friends, but even under the law from 2000 through 2004 the member could have had only one registered domestic partner at a time and was restricted in how often he or she could change registered partners. As far as the parties' briefs reveal, plaintiffs were the only registered partners seeking benefits at BHCC, but even at a club with several members in registered partnerships, according golfing privileges to each such member would not have significantly impacted tee times or course conditions. What the majority observes about plaintiffs' partnership today was equally true in 2000 to 2004: extending club benefits to plaintiff French "would not create the stampede on the fairway that BHCC appears to envision." (Maj. opn., *ante*, at p. 847.)

BHCC's second asserted concern, that extending privileges would result in "free riding, i.e. inviting guests who are avid golfers who would use the club repeatedly, at a fraction of what it would cost to become a member," is similarly no more applicable to registered domestic partners under the 2000–2004 laws than to partners registered under the current act. Providing registered domestic partners club privileges would not have allowed a club member simply to get his or her favorite golfing partner onto the course as a domestic partner; rather, the member would have had to declare to the

---

[11] All further unspecified statutory references are to the Family Code.

Secretary of State, on pain of misdemeanor criminal liability, that the two shared a residence and were financially responsible for each other's needs, a responsibility enforceable by creditors. (Former §§ 297, subd. (e), 298, subd. (c).) That significant numbers of club members would have falsely so declared, thus subjecting themselves to financial responsibilities and possible criminal liability and, in many cases, impliedly misrepresenting their sexual orientation, is highly unlikely.

Denying registered domestic partners club privileges could, in theory, have encouraged some partners of members to purchase their own memberships. But that is equally true today, under the current version of the domestic partnership law, yet the majority holds that neither that, nor any other legitimate business interest, currently justifies denying privileges to domestic partners. For that matter, the asserted justification would then, as now, apply in vastly higher numbers to members' spouses: had BHCC not extended club privileges to spouses, many husbands and wives of members could have been expected to purchase their own memberships, thus improving BHCC's business position.

BHCC presumably did not deny privileges to spouses because to do so would have impeded the club's third asserted goal, that of "creating a family-friendly environment by welcoming the immediate family of married members." But that goal, as well, fails to justify denying privileges to registered domestic partners. By "family-friendly environment," BHCC, which denies having intentionally discriminated on the basis of sexual orientation, cannot mean a club devoid of gay and lesbian members. As the Unruh Civil Rights Act proscribes discrimination on the basis of sexual orientation (maj. opn., *ante*, at p. 852, see *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155 [278 Cal.Rptr. 614, 805 P.2d 873]), a business could not defend against liability for marital status discrimination by claiming such discrimination was warranted as a means to effectuate sexual orientation discrimination. A prohibited discriminatory goal cannot itself constitute a *legitimate* business interest justifying discrimination.

By a "family-friendly" club environment, then, I take BHCC to mean not an environment excluding gay and lesbian couples, but, rather, an environment that welcomes members' immediate families and includes them in club activities, promoting fuller social relationships within the club membership. This is a legitimate goal; BHCC reasonably could want club members to get to know each other better by golfing and socializing with one another's families, but this goal would be disserved, not served, by the club's policy of denying club privileges to registered domestic partners of members. Even under California's first domestic partnership law, a couple registered as domestic partners necessarily lived together, were financially responsible for

one another's needs, and had "chosen to share one another's lives in an intimate and committed relationship of mutual caring." (Former § 297.) Again, what the majority says of the current day was no less true in the 2000–2004 period: the interest in "promoting a 'family-friendly environment' . . . is not furthered by excluding families formed through domestic partnership." (Maj. opn., *ante*, at p. 847.)

In finding that legitimate business interests justified BHCC's marital status discrimination prior to 2005, the majority repeats BHCC's claims its policy avoided overutilization, encouraged new memberships, and helped create a family-friendly environment. (Maj. opn., *ante*, at pp. 851–852.) But, as shown above, these interests no more justified denying club privileges to members' registered domestic partners before January 1, 2005, than they did after that date.

The majority also echoes, as an asserted business interest, BHCC's claim (in discussing the consequences of holding that the Unruh Civil Rights Act prohibits marital status discrimination) that it would have to make club facilities freely available to members' friends because, absent a marriage requirement, it would have no way, without intruding on members' privacy, to distinguish among nonmarital relationships. BHCC, the majority reasons, was not required to use criteria or methods of proof that were "arguably less reliable and more intrusive than a marriage license to ascertain the nature and stability of its unmarried members' relationships." (Maj. opn., *ante*, at p. 852.) While this reason justifies rejecting plaintiffs' claim that BHCC's policy illegally discriminates against *all* unmarried couples, it carries no justificatory power with regard to registered domestic partners, whose status is readily and nonintrusively verifiable by their registration. The majority makes precisely this observation in rejecting BHCC's justification for its current discrimination (*id.* at p. 847), but unaccountably ignores it in addressing past discrimination.

The majority's fundamental illogic lies in virtually ignoring plaintiffs' previous domestic partner registration in considering their claim of discrimination before 2005, while relying heavily on the legal effect of their present registration under the current law. In a footnote, the majority asserts plaintiffs "do not base their marital status discrimination claim for this period of time on those [earlier domestic partnership] statutes." (Maj. opn., *ante*, at p. 852, fn. 10.) But in their opening brief, plaintiffs relied expressly on the earlier laws, arguing that BHCC could have verified couplehood without an intrusive investigation because "since January 1, 2000, California has allowed non-married couples to register as domestic partners with the state (see Fam. Code, §§ 297–298.5), providing a simple 'bright line' if one were needed."

At oral argument, to be sure, plaintiffs' counsel explained that plaintiffs' marital status discrimination claim for damages did not *depend* on the domestic partnership laws; BHCC's discrimination, he argued, was and is illegal as to *all* unmarried couples, whether or not registered as domestic partners. But this description of plaintiffs' broad theory applied as well to plaintiffs' claim for injunctive relief, which the majority allows to go forward. Counsel, moreover, acknowledged that the current law provided him with the strongest case for equal treatment of domestic partners and married couples. In so doing, counsel did not concede that the Unruh Civil Rights Act afforded no protection to domestic partners under prior law; nor did he argue, contrary to plaintiffs' opening brief, that plaintiffs' registration as domestic partners (under either law) should be ignored if the court rejected their broad claim of discrimination against all unmarried couples.[12]

Like the majority, I would reject plaintiffs' broad claim that the Unruh Civil Rights Act forbids BHCC from discriminating between married and *any* unmarried couples. But plaintiffs' having advanced such a broad claim should not blind us to the narrower, more meritorious argument they have also made-that BHCC had no legitimate business interest justifying denial of club privileges to registered domestic partners, whose registration with the Secretary of State, as plaintiffs point out, provides "a simple 'bright line' if one were needed." The majority recognizes this as to plaintiffs' claim for prospective relief but illogically denies it as to their claim for damages. For this reason, I respectfully dissent from part II.C. of the majority opinion insofar as it rejects the claim for damages for marital status discrimination.

I also differ in one respect with the majority's analysis of plaintiffs' claim of sexual orientation discrimination. The majority holds, and I agree, that the evidence of discriminatory animus on the part of BHCC's directors, together with evidence that BHCC informally extended spousal benefits to unmarried heterosexual members while repeatedly refusing to modify its policies so as to extend such benefits to plaintiffs and other homosexual couples, supports a

---

[12] The majority also points to procedural and substantive differences between current and prior domestic partnership laws. (Maj. opn., *ante*, at p. 852, fn. 10.) In my view, however, neither that domestic partnerships prior to 2005 could be dissolved without a judicial proceeding nor that they accorded partners more limited substantive rights than current law demonstrates that the legitimate business interests BHCC posits justified its discriminatory policy. The goals of limiting access and preventing "free riding" were met by provisions preventing a partnership from being quickly or informally exchanged for a new partnership. (Former §§ 298.5, subd. (c), 299, subd. (b).) As to creation of a family-friendly environment, that the original law defined domestic partners as "shar[ing] one another's lives in an intimate and committed relationship of mutual caring" (former § 297, subd. (a)) and made partners financially responsible for one another's needs (*id.*, subd. (b)(2)) amply demonstrates that, even prior to 2005, partners were, as the Legislature characterized them, one another's "immediate family members." (Stats. 1999, ch. 588, § 1.)

claim of discriminatory application. (Maj. opn., *ante*, at p. 854.) But the same evidence would also appear to support plaintiffs' claim that BHCC maintained its spousal benefit limitation as a "subterfuge" or "device" (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 538 [30 Cal.Rptr.2d 706]) to accomplish prohibited discrimination on the basis of sexual orientation. Contrary to the majority's characterization, plaintiffs do not ask the court to infer such intentional sexual orientation discrimination "*solely* from such [differential] effects" on homosexual members (maj. opn., *ante*, at p. 854), but, rather, point to what they contend is significant record evidence "that this was [BHCC's] specific intent in maintaining this policy." The evidence that BHCC used its marital status rule as a subterfuge for intentional sexual orientation discrimination may not be sufficient to survive summary judgment, but the majority should at least acknowledge that plaintiffs, in a contention distinct from what the majority characterizes as a disparate impact claim, do argue for such a conclusion.