[No. A117071. First Dist., Div. Five. Oct. 30, 2008.]

ANDRES TURNER et al., Plaintiffs and Respondents, v.
ASSOCIATION OF AMERICAN MEDICAL COLLEGES, Defendant and
Appellant.

COUNSEL

Fulbright & Jaworski, Robert E. Darby, Robert A. Burgoyne and Caroline M. Mew for Defendant and Appellant.

Disability Rights Advocates, Sid Wolkinsky, Roger Heller; Goldstein, Demchak, Baller, Bogen & Dardarian, Linda Dardarian; Schneider & Wallace and Joshua Konecky for Plaintiffs and Respondents.

OPINION

**NEEDHAM, J.**—Individuals with learning disabilities and other conditions affecting their ability to read may, when taking a standardized test, seek

reasonable testing accommodations under the Americans with Disabilities Act of 1990 (ADA). (42 U.S.C. §§ 12101 et seq., 12189.) This case presents the question of whether persons taking such tests in California are additionally entitled to accommodations under the state's Unruh Civil Rights Act (the Act) and Disabled Persons Act (DPA). (Civ. Code, §§ 51, 54–55.) We conclude these state law provisions do not require testing accommodations for reading-related disabilities.

## I. *Background*

The Association of American Medical Colleges (AAMC) is a nonprofit organization whose members include medical schools and teaching hospitals throughout the country. Its mission is to improve public health by enhancing the effectiveness of academic medicine. Among other things, AAMC develops and administers the Medical College Admission Test (MCAT), a nationwide standardized test designed to assess a medical school applicant's knowledge of basic science concepts, writing skills and facility in problem solving and critical thinking.[1]

The MCAT is designed to predict success during medical school. It consists of multiple-choice questions and a writing section and is assigned a scaled score when it is graded. The MCAT is useful to medical schools because it allows them to compare an applicant's performance to that of others under standardized conditions. Admissions departments consider the MCAT along with other factors such as a student's grades in undergraduate school when evaluating a medical school applicant. The spaces in medical schools are limited and the application process is highly competitive.

Although it is a timed examination, the MCAT is not designed to measure reading speed per se. The time limits on the MCAT have not been correlated with the reading or problem solving speed necessary for success in medical school or the practice of medicine. Applicants with reading-related learning disabilities such as dyslexia or conditions such as attention deficit hyperactivity disorder (ADHD) may have difficulty completing the test in the allotted time. In such cases, AAMC entertains requests for accommodations such as additional time to complete the examination or a separate room to minimize distractions. AAMC puts a notation or "flag" on any test taken under nonstandard conditions to alert medical schools that the score should carry less weight relative to other factors in the admissions process.

Individuals who have difficulty reading as a result of their disability may, nonetheless, possess superior intelligence and reasoning skills. The accommodation of applicants with learning and reading-related disabilities on a

---

[1] AAMC administers the MCAT through a third party test vendor, American College Testing (ACT).

standardized test is designed to level the playing field, not to give those individuals an advantage. Nonetheless, accommodating such disabilities creates an inherent tension between the various interests at stake. On the one hand, when a test is not designed to measure reading speed, time limits can compromise its ability to accurately measure the skills and knowledge of applicants with such disabilities. In such cases, applicants may possess the ability to solve a particular problem, but be unable to do so because the time constraint placed by the testing agency does not allow them sufficient time to decode the question asked. On the other hand, the value of standardized tests lies in the ability to compare the relative scores of different applicants. If accommodations alter what is being tested, the comparability of scores may be compromised and the person receiving the accommodations may receive a benefit not given to a person taking the test under standard conditions.

When AAMC is presented with a request for accommodations on the MCAT, it reviews that request under the standards set by the ADA. Under the ADA, a person claiming a right to reasonable accommodations for a disability must demonstrate "a physical or mental impairment that *substantially limits* one or more of the major life activities of such individual." (42 U.S.C. § 12102(2)(A), italics added.) Thus, an MCAT applicant with a reading-related learning disability or ADHD would have to demonstrate that the disability or condition substantially limits the major life activities of reading or test taking.

Plaintiffs Andres Turner, Anne Cashmore, Brendan Pierce and David Lebovitz are California residents with reading-related learning disabilities and/or ADHD who applied to take the MCAT in California in 2004. They each requested more time and/or a private room in which to take the test. AAMC denied plaintiffs' requests, after which they filed this class action lawsuit alleging state law violations of the Unruh Civil Rights Act and DPA. (Civ. Code, §§ 51, 54–55.)[2] The complaint alleged that plaintiffs' requests for accommodations should have been considered under these state laws, which define "disability" more broadly than the ADA to include a mental, psychological or physical condition that "limits a major life activity," i.e., that "makes the achievement of the major life activity difficult." (Civ. Code, §§ 51, subd. (e)(1), 54, subd. (b)(1); Gov. Code, § 12926, subds. (i)(1)(B), (k)(1)(B)(ii).)

AAMC did not dispute that the California definition of disability as one that "limits" a major life activity by making it "difficult" is more inclusive

---

[2] The complaint also named two organizational plaintiffs, the National Disabled Students Union and the International Dyslexia Association, and included a cause of action for violation of Business and Professions Code section 17200. In its final judgment, the court dismissed the organizational plaintiffs based on their lack of standing to seek injunctive relief and rejected the cause of action under the Business and Professions Code.

than the ADA's "substantially limits" standard. (See *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1026 [130 Cal.Rptr.2d 662, 63 P.3d 220].) Instead, AAMC took the position that application of the California standard was not appropriate because the MCAT was a nationwide test and accommodation requests had to be evaluated under the same standard throughout the country. As an affirmative defense, AAMC claimed the Unruh Civil Rights Act and DPA did not apply because the use of the state law standard of disability for California residents taking the MCAT in California would violate the commerce clause of the federal Constitution. AAMC also took the position that AAMC was not a "business establishment" within the meaning of the Unruh Civil Rights Act, that an Unruh Civil Rights Act claim could not succeed absent a showing of intentional discrimination, that the DPA only guaranteed access to physical facilities, and that neither the Unruh Civil Rights Act nor the DPA required reasonable accommodations on a standardized test.

The trial court granted plaintiffs' motion for summary judgment on the commerce clause defense, concluding the application of the California standard of disability to MCAT applicants would not unduly burden interstate commerce relative to the important public interest served by the state civil rights statutes. It denied a motion for judgment on the pleadings brought by AAMC, ruling that the Unruh Civil Rights Act and DPA applied to the administration of the MCAT and required AAMC to provide reasonable accommodations to individuals who were disabled under their provisions. The court also granted plaintiffs' motion for class certification "for the limited purpose of determining whether AAMC must apply California law to the members of the defined class." The court declined to resolve the individual claims of any class member or to specify the accommodations necessary on a classwide basis.[3]

Following a five-day bench trial to determine appropriate injunctive and declaratory relief, the court issued a detailed statement of decision including the following orders: (1) AAMC must apply the Unruh Civil Rights Act and DPA to California residents applying for testing accommodations on the MCAT; (2) AAMC must provide reasonable accommodations that do not otherwise fundamentally alter the MCAT to persons with established disabilities as defined under the Unruh Civil Rights Act and DPA; and (3) AAMC must submit to the court within 60 days a report reflecting its development of internal procedures for considering accommodation requests under the Unruh

---

[3] After this lawsuit was filed, AAMC allowed plaintiffs Turner and Pierce to take the MCAT with the accommodations they requested following their submission of additional information documenting their disabilities. Plaintiffs Lebovitz and Cashmore took the MCAT without accommodations, with Lebovitz scoring in the 90th–92d percentile and Cashmore scoring in the 69th–74th percentile.

Civil Rights Act and DPA. Plaintiffs were designated the prevailing parties under Civil Code section 55 and Code of Civil Procedure section 1021.5 for the purpose of seeking attorney fees and costs.

The court later awarded plaintiffs approximately $1,969,000 in attorneys fees and costs under Civil Code section 55: $1,884,247 in prejudgment legal fees (based on a lodestar award of $1,449,421 times a multiplier of 1.3), $60,000 in fees for their work preparing the motion for legal fees, and $25,489.05 in costs. AAMC appeals.

## II. *Discussion*

### A. *Introduction and Standard of Review*

AAMC argues that neither the Unruh Civil Rights Act nor the DPA require it to provide testing accommodations to disabled individuals taking a standardized test such as the MCAT. The trial court's ruling that the Unruh Civil Rights Act and DPA applied to the MCAT was made in the context of an order denying AAMC's motion for judgment on the pleadings. Such an order would not, typically, amount to a final resolution of this issue, but it was reiterated in the statement of decision following the court trial and was treated by the court and the parties as dispositive. In any event, because the relevant facts are not in dispute and because the interpretation of the Unruh Civil Rights Act and DPA is an issue of law, we review de novo the court's ruling that those statutes apply to the administration of the MCAT in California. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)[4] As explained below, we conclude that neither statute applies to AAMC's consideration of accommodation requests for learning and reading-related disabilities.

### B. *The Unruh Civil Rights Act Does Not Require the Alteration of Standardized Testing Conditions to Accommodate Applicants with Learning and Reading-related Disabilities*

The Unruh Civil Rights Act prohibits discrimination based on a person's membership in a particular group: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).) "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to [the

---

[4] The parties do not suggest otherwise.

act]" is liable for damages and penalties. (Civ. Code, § 52, subd. (a).) ▮ Injunctive relief is also available and may extend to all persons similarly situated to plaintiff. (*Vargas v. Hampson* (1962) 57 Cal.2d 479, 481 [20 Cal.Rptr. 618, 370 P.2d 322]; *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 471–472 [20 Cal.Rptr. 609, 370 P.2d 313].)

▮ Despite its broad application, the Unruh Civil Rights Act does not extend to practices and policies that apply equally to all persons: "This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation." (Civ. Code, § 51, subd. (c); *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1172 [278 Cal.Rptr. 614, 805 P.2d 873] (*Harris*).) A policy that is neutral on its face is not actionable under the act, even when it has a disproportionate impact on a protected class. (*Harris*, at pp. 1172–1173; *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1238 [60 Cal.Rptr.3d 631] (*Belton*).)

In *Harris*, the plaintiffs were prospective tenants who brought an action under the Unruh Civil Rights Act against a landlord who required that they have a minimum income of three times the amount of rent. (*Harris, supra,* 52 Cal.3d at p. 1148.) After rejecting the argument that economic discrimination was cognizable under the act, our Supreme Court considered the alternative claim of gender discrimination based on a theory that the minimum income requirement had a disproportionate effect on women, who made less money on average than did men. (*Harris,* at pp. 1170–1175.) It noted that the language of the damages provision of Civil Code section 52—which referred to denying, aiding and inciting the denial of access to public accommodations—"point[ed] to an emphasis on intentional discrimination" and implied the need for "willful, affirmative misconduct on the part of those who violate the Act." (*Harris,* at p. 1172.) Moreover, "the Act explicitly exempts standards that are 'applicable alike to persons of every sex, color, race . . . .' (§ 51.) By its nature, an adverse impact claim challenges a standard that is applicable alike to all such persons based on the premise that, notwithstanding its universal applicability, its actual impact demands scrutiny. If the Legislature had intended to include adverse impact claims, it would have omitted or at least qualified this language in section 51." (*Harris,* at pp. 1172–1173.)

In *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824 [31 Cal.Rptr.3d 565, 115 P.3d 1212] (*Koebke*), the lesbian partner of a woman who belonged to a private country club was denied club privileges available to members' spouses. (*Id.* at p. 831.) She filed a lawsuit claiming that this policy amounted to discrimination based on sexual orientation because same-

sex couples could not legally marry at that time. (*Id.* at p. 854.) The court reaffirmed that an Unruh Civil Rights Act violation requires more than a disparate impact on a particular group and concluded the plaintiff could not state a claim under this theory when the policy extended to all unmarried couples, regardless of their sexual orientation.[5]

A disparate impact claim predicated on disability was rejected in *Belton*, in which plaintiffs who were blind complained that a cable company's policy of packaging its music services with television programming was discriminatory because sighted persons could fully use the television whereas blind persons could not. (*Belton, supra*, 151 Cal.App.4th at pp. 1237–1238.) Citing *Harris* and *Koebke*, the court concluded the challenged policy did not violate the Unruh Civil Rights Act because it applied equally to all customers and did not target those with visual disabilities, even if it had a disparate effect on the latter group. (*Belton*, at pp. 1237–1238.)

In this case, AAMC has established certain standards for the administration of the MCAT, including a time limit for each section of the test. These standards are neutral and extend to all applicants regardless of their membership in a particular group. Plaintiffs' claim under the Unruh Civil Rights Act is effectively an argument that these general policies are discriminatory because they have a disparate impact on those with learning and reading-related disabilities, who have a more difficult time taking tests under standard conditions. Under *Harris, Koebke* and *Belton*, this disparate impact analysis cannot be the basis for an Unruh Civil Rights Act claim. Whatever entitlements plaintiffs may have to testing accommodations under other civil rights statutes, the trial court erred in concluding that AAMC's standardized procedures implicate the act, at least as applied to individuals with learning and reading-related disabilities seeking additional time or similar performance-related accommodations when taking the MCAT.

Plaintiffs attempt to distinguish *Harris, Koebke* and *Belton* on the ground that their claim is based on AAMC's failure to provide reasonable accommodations, rather than on the disparate impact of its policies. They rely primarily on two federal decisions holding that a claim based on failure to provide reasonable accommodations as required by the ADA did not additionally require proof of disparate treatment or disparate impact. (*McGary v. City of Portland* (9th Cir. 2004) 386 F.3d 1259, 1265–1266; *Henrietta D. v. Bloomberg* (2d Cir. 2003) 331 F.3d 261, 276–277.)

These cases are inapposite because they were decided under the ADA, which "not only protects against disparate treatment, [but] also creates an

---

[5] The plaintiff was entitled to pursue a cause of action for discrimination based on marital status for the period of time following the passage of the California Domestic Partner Rights and Responsibilities Act of 2003. (*Koebke, supra*, 36 Cal.4th at p. 850.)

affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.' " (*Dunlap v. Association of Bay Area Governments* (N.D.Cal. 1998) 996 F.Supp. 962, 965.) While it is true that plaintiffs are seeking reasonable accommodations for their learning and reading-related disabilities, it does not follow that such preferred treatment or accommodations are required under the Unruh Civil Rights Act in the face of the language in Civil Code section 51, subdivision (c).

■ This does not mean that disabled persons in California may not seek reasonable accommodations for their learning and reading-related disabilities when taking a standardized test. The Unruh Civil Rights Act *does* indirectly penalize a failure to grant reasonable accommodations in Civil Code section 51, subdivision (f), which incorporates otherwise relevant ADA standards as a "floor" under state law: "A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." (See *Bass v. County of Butte* (9th Cir. 2006) 458 F.3d 978, 982.) The ADA requires reasonable accommodations on standardized tests for those with qualifying disabilities: "Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." (42 U.S.C. § 12189; see *Agranoff v. Law School Admission Council, Inc.* (D.Mass. 1999) 97 F.Supp.2d 86, 87–88.) Any violation of this ADA requirement would also be a violation of the Unruh Civil Rights Act by virtue of Civil Code section 51, subdivision (f).

■ In the context of this case, Civil Code section 51, subdivision (c) and the cases construing it can be readily harmonized with section 51, subdivision (f) and the ADA provisions it incorporates. Simply put, in addressing a claim that a facially neutral testing policy has a disparate impact on persons with learning and reading-related disabilities, accommodations are required to the extent they are required under the ADA. In this case, there is no allegation that AAMC has failed to comply with the ADA in considering requests for accommodations on the MCAT, and plaintiffs have therefore failed to establish their entitlement to relief under the Unruh Civil Rights Act. (Contrast *Cloutier v. Prudential Ins. Co. of America* (N.D.Cal. 1997) 964 F.Supp. 299, 303–304, 307 [though insurer did not directly violate the act in denying coverage to HIV-negative persons having a current sexual relationship with an HIV-positive partner, plaintiff could state a claim under Civ. Code, § 51, subd. (f) based on potential violation of ADA].)

As this case demonstrates, some individuals who would be considered disabled under California's more inclusive definition of disability will not be

deemed disabled for purposes of the ADA and will not be entitled to relief under Civil Code section 51, subdivision (f). If the Legislature wishes to amend the Unruh Civil Rights Act to require reasonable accommodations for all persons meeting the California standard of disability it may do so, but it is not within our province to rewrite the statute. (*People v. Burgio* (1993) 16 Cal.App.4th 769, 778 [20 Cal.Rptr.2d 397].)

Finally, we note that this is not a case in which there was any allegation or evidence that AAMC applied its facially neutral policy in an intentionally discriminatory manner. In *Koebke*, the court recognized that an Unruh Civil Rights Act violation might arise from a situation in which a neutral policy was used as a pretext to discriminate against a protected class of individuals. (*Koebke, supra*, 36 Cal.4th at pp. 854–855.) Though the complaint in this case alleged that AAMC has relied on "discriminatory and arbitrary criteria to deny requests for accommodations," plaintiffs have neither alleged nor proven that AAMC was motivated by an animus toward those with learning and reading-related disabilities or granted accommodation to other groups or disabled individuals that it did not grant to those with learning and reading-related disabilities.

> C. *The DPA Guarantees Access to Public Places but Does Not Require a Modification of Standardized Testing Procedures to Accommodate Learning and Reading-related Disabilities*

■ Whereas the Unruh Civil Rights Act bars discrimination against several classes of individuals, the DPA more narrowly protects those who suffer from disabilities. Contained in part 2.5 of division 1 of the Civil Code, entitled "Blind and Other Physically Disabled Persons" and originally limited to persons with physical disabilities (see Civ. Code, § 54 (added by Stats. 1968, ch. 461, § 1, p. 1092; amended by Stats. 1992, ch. 913, § 4, p. 4286)), the DPA now extends more broadly to persons with "any mental or physical disability as defined in Section 12926 of the Government Code." (Civ. Code, § 54, subd. (b)(1).)

Under the DPA, "Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places." (Civ. Code, § 54, subd. (a).) Additionally, "Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including hospitals, clinics, and physicians' offices, and privileges of all common carriers, airplanes, motor vehicles, railroad trains, motorbuses, streetcars, boats, or any other public conveyances or modes of transportation . . .

telephone facilities, adoption agencies, private schools, hotels, lodging places, places of public accommodation, amusement, or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons." (Civ. Code, § 54.1, subd. (a)(1).)

■ The DPA is "intended to secure to disabled persons the 'same right as the general public to the full and free use' of facilities open to the public." (*Urhausen v. Longs Drug Stores California, Inc.* (2007) 155 Cal.App.4th 254, 261 [65 Cal.Rptr.3d 838].) Its focus is upon *physical* access to public places, though the statute may also be construed as requiring equal physical access to a nontangible location such as an Internet site. (Compare *Wilson v. Haria and Gogri Corp.* (E.D.Cal. 2007) 479 F.Supp.2d 1127, 1140, fn. 16, with *National Federation of Blind v. Target Corp.* (N.D.Cal. 2007) 582 F.Supp.2d 1185.) Although the DPA now protects persons with mental disabilities, the published cases have involved challenges of physically disabled individuals denied access to some public site or service due to their disability. (E.g., *Californians for Disability Rights v. Mervyn's LLC* (2008) 165 Cal.App.4th 571, 580–581 [81 Cal.Rptr.3d 144] [claim that store did not provide adequate pathways, making merchandise inaccessible to persons using wheelchairs or other mobility devices]; *Madden v. Del Taco, Inc.* (2007) 150 Cal.App.4th 294, 296 [58 Cal.Rptr.3d 313] [concrete trash container that blocked restaurant entrance and caused wheelchair-bound plaintiff to fall]; *Hankins v. El Torito Restaurants, Inc.* (1998) 63 Cal.App.4th 510, 515 [74 Cal.Rptr.2d 684] [patron on crutches denied permission to use the only bathroom on first floor, which was reserved for employees]; *Donald v. Sacramento Valley Bank* (1989) 209 Cal.App.3d 1183, 1186–1187 [260 Cal.Rptr. 49] [quadriplegic could not access bank's automatic teller machine from wheelchair due to the steps in front of it].)

AAMC argues that the DPA cannot be read to require accommodations for learning and reading-related disabilities on a standardized test. We agree. Civil Code section 54, subdivision (a) entitles disabled persons to "full and free use" of "public *places*." (Italics added.) Although there is no question the testing facilities used by AAMC to administer the MCAT constitute "public places" to which access is required, plaintiffs made no allegation or showing that AAMC has denied any person with a disability access to those facilities. Nothing in the language of section 54 can be reasonably construed to require a modification of the test procedures themselves, except to the extent necessary to guarantee physical access to the place in which the test is administered.

Civil Code section 54.1, subdivision (a)(1) restates the DPA's access requirement as one of "full and equal access, *as other members of the general*

*public*, to accommodations, advantages, [and] facilities . . . ." (Italics added.) The reference to "advantages" might be broadly interpreted to require equal access in the taking of the MCAT itself, in addition to the facility in which it is administered. But, the statute qualifies the requirement of "full and equal access" by describing it as that available to "other members of the general public." (Civ. Code, § 54.1, subd. (a)(1).) It does not entitle a disabled individual to greater access than the public at large. Other members of the general public are not entitled to the performance-related accommodations sought by plaintiffs in this case, and there is nothing in the DPA requiring a testing entity to alter the conditions of a standardized test.

Like the Unruh Civil Rights Act, the DPA incorporates the ADA to the extent that "A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section." (Civ. Code, § 54, subd. (c).) Because plaintiffs made no allegation or showing that AAMC violated the ADA, this provision does not support a judgment under the DPA.

### D.  *Conclusion*

■ Individuals with learning and reading-related disabilities affecting their ability to rapidly process written information are entitled to reasonable accommodations when taking the MCAT, assuming they suffer from an impairment that "substantially limits" the major life activities of reading and/or test taking within the meaning of the ADA. (42 U.S.C. § 12102(2)(A).) AAMC is not required to utilize the more inclusive standard for assessing disabilities under the Unruh Civil Rights Act and DPA. The judgment granting injunctive relief must be reversed, as must the award of attorney fees and costs to plaintiffs as prevailing parties. (See *Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1437, fn. 75 [131 Cal.Rptr.2d 684].)

■ We emphasize that our holding today is a narrow one—that the Unruh Civil Rights Act and DPA do not, by their own terms, require performance-related accommodations (additional time, private rooms) for MCAT applicants with learning or reading-related disabilities. There was no allegation by plaintiffs that MCAT applicants with purely physical disabilities had been denied reasonable accommodations for those disabilities, and we have no occasion to consider whether the act or DPA would apply in such a situation. We also emphasize that plaintiffs asserted no cause of action based on a violation of the ADA, and that the issue of whether AAMC has properly applied ADA standards to accommodation requests is not before us.

Our conclusion that the Unruh Civil Rights Act and DPA do not require accommodations for learning and reading-related disabilities on standardized

tests obviates the need to consider AAMC's alternative claims concerning the commerce clause, the status of AAMC as a "business establishment" for purposes of the Unruh Civil Rights Act, the scope of the injunctive relief granted, or the trial court's determination that plaintiffs were prevailing parties for the purpose of awarding attorney fees and costs. AAMC's motion for judicial notice of various documents, including those pertaining to standards used by other organizations when evaluating requests for disability accommodations, is denied as moot.

### III.  *Disposition*

The judgment is reversed, as is the order awarding plaintiffs attorney fees and costs. Costs on appeal are awarded to appellant AAMC.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied November 25, 2008, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied February 11, 2009, S168908. Werdegar, J., did not participate therein. Chin, J., was of the opinion that the petition should be granted.