Filed 5/10/23  Rios v. Webroot CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ROY RIOS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>WEBROOT INC.,<br><br>    Defendant and Respondent. | B310399<br><br>Los Angeles County<br>Super. Ct. No.<br>20STCV11891 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.

Pacific Trial Attorneys, Scott J. Ferrell, David W. Reid, Victoria C. Knowles, and Richard H. Hikida for Plaintiff and Appellant.

Vedder Price, James V. Garvey and Marie E. Christiansen for Defendant and Respondent.

Plaintiff Roy Rios appeals a judgment of dismissal entered after an order sustaining defendant Webroot Inc.'s demurrer to the operative complaint without leave to amend. Plaintiff alleges Webroot violated the Unruh Civil Rights Act (Civ. Code, § 51 et seq., Unruh Act)[1] by intentionally maintaining a retail website that is inaccessible to visually impaired individuals. He argues the trial court erred in concluding (1) the complaint fails to allege sufficient facts to establish Webroot's discriminatory intent; and (2) the alleged inaccessibility of Webroot's website does not violate the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (the ADA), specifically title III of the ADA (42 U.S.C. §§ 12181–12189) (Title III). Consistent with the recent opinion of our colleagues in Division One, we conclude (1) the alleged disparate impact of Webroot's facially neutral website is insufficient to establish intentional discrimination under the Unruh Act; and (2) Webroot's website does not constitute a "place of public accommodation" (42 U.S.C. § 12182(a)) under Title III. (See *Martinez v. Cot'n Wash, Inc.* (2022) 81 Cal.App.5th 1026, 1032–1033 (*Martinez*).) We affirm.

**FACTS AND PROCEDURAL HISTORY**

We draw the facts from the allegations of plaintiff's operative first amended complaint and other matters properly subject to judicial notice. (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 764; *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885.) "[W]e treat as true all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Freeman*

---

[1] Statutory references are to the Civil Code, unless otherwise designated.

*v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 178, fn. 3.)

Webroot owns and operates a publicly accessible website that "provides access" to its "array of products and services, including descriptions of its products, amenities and services, online shops, and many other benefits related to its products and services."[2]

Plaintiff is permanently blind. He must use screen reading software to read website content and access the Internet. He visited Webroot's website both "to avail himself" of Webroot's goods and services and in connection with his work as a " 'tester' " who " 'visit[s] places of public accommodation to determine their compliance with Title III.' "

Webroot's website "contains numerous access barriers preventing [p]laintiff, and other blind and visually-impaired individuals, from gaining equal access to the [w]ebsite." Among other things, the website is not designed to be read by screen reading software, which "provides the only method by which a blind person may independently access the [I]nternet." Despite several attempts in the months before filing his lawsuit, plaintiff was denied "full and equal access" to Webroot's website.

---

[2] The complaint does not specify what products and services Webroot offers to the public through its website. According to a declaration offered by a Webroot executive, the company is an "online business that sells Internet security products to consumers and businesses." Consistent with the complaint's allegations, the declaration states these products are "sold through Webroot's website, or through third-party retailers, such as Amazon and Best Buy," and "Webroot maintains no brick-and-mortar retail presence."

Plaintiff's attorney sent a letter to Webroot notifying the company about plaintiff's disability and the inaccessibility of its website.  The letter invited Webroot to contact plaintiff's counsel to discuss the matter.  Webroot did not respond to the letter or address the "communication barriers" on its website.  After waiting 11 months, plaintiff filed this lawsuit against the company.

Webroot challenged the pleading by demurrer, arguing (1) its alleged maintenance of an inaccessible website, even after being notified of the website's inaccessibility, was insufficient to establish intentional discrimination under the Unruh Act; and (2) its website did not constitute a place of public accommodation under Title III absent some "nexus" to a "*physical* place."

The trial court sustained Webroot's demurrer without leave to amend and entered a judgment dismissing plaintiff's lawsuit.  This appeal followed.

## DISCUSSION

### 1.  *The Unruh Civil Rights Act*

The Unruh Act provides:  "All persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  (§ 51, subd. (b).)  "A plaintiff can recover under the [Unruh Act] on two alternate theories:  (1) a violation of the ADA (§ 51, subd. (f)); or (2) denial of access to a business establishment based on intentional discrimination."  (*Martinez v. San Diego County Credit Union* (2020) 50 Cal.App.5th 1048, 1059 (*SDCCU*); *Martinez, supra,* 81 Cal.App.5th at p. 1035.)

4

## 2. *The Alleged Facts Do Not Establish Intentional Discrimination*

Except when alleging a violation of the ADA, " 'a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act.' "[3] (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 854 (*Koebke*), quoting *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175; see *Martinez, supra,* 81 Cal.App.5th at p. 1036.) Critically, " '[a] disparate impact analysis or test does not apply to Unruh Act claims.' " (*Koebke,* at p. 854, quoting *Harris,* at p. 1175; § 51, subd. (c) [standards that are "applicable alike to persons of every sex, color, race, religion, ancestry, national origin, or blindness or other physical disability" are exempt from Unruh Act].) Thus, our Supreme Court has instructed that a claimant may not "rel[y] on the effects of a facially neutral policy on a particular group . . . to infer solely from such effects a discriminatory intent." (*Koebke,* at p. 854.) Rather, the claimant must allege facts establishing the defendant engaged in " 'willful, affirmative misconduct' " (*id.* at p. 853) with the specific intent "to accomplish discrimination on the basis of [a protected trait]." (*Id.* at p. 854.) Although "evidence of disparate impact . . . 'may be probative of intentional discrimination in some cases,' " it will not alone establish discriminatory intent. (*Ibid.,* italics omitted; *Martinez, supra*, 81 Cal.App.5th at p. 1036.)

---

[3] Unlike Title III, it is settled that the Unruh Act's protections extend to "all business establishments of every kind whatsoever" (§ 51, subd. (b)), including a "website" with no nexus to "a brick-and-mortar vendor." (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1027.)

5

Plaintiff contends his allegations regarding the "pre-filing demand letter" are sufficient to establish intentional discrimination under the Unruh Act.  He argues these allegations establish Webroot "knew of the accessibility problems" with its website, but "nevertheless took no steps to address the communication barriers."  He maintains this failure to act is sufficient to demonstrate willful discrimination.

The plaintiff in *Martinez* made the same argument, relying on substantively identical allegations in his complaint.  (See *Martinez, supra,* 81 Cal.App.5th at p. 1036 [plaintiff "argues the [complaint's] allegations establish [defendant] ' "failed to take adequate actions to correct" ' accessibility barriers in its website ' "even after being notified" ' of them in correspondence from [plaintiff's] counsel"].)  The *Martinez* court rejected that argument, recognizing that "if, under the reasoning of *Koebke*, [plaintiff] cannot establish [defendant's] intent to discriminate by showing only that its website does not allow visually impaired individuals the same access available to those who are not visually impaired (i.e., a disparate effect of a neutral structure), it follows that [defendant's] *failure to address* this disparate effect likewise cannot establish [defendant's] intent to discriminate."  (*Ibid*., citing *Koebke, supra,* 36 Cal.4th at p. 854.) This analysis is sound, and we agree that, under *Koebke*, Webroot's alleged failure to address the disparate effect of the neutral structure of its website is insufficient to establish intentional discrimination under the Unruh Act.  (See § 51, subd. (c); see also *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1229–1230, 1237–1239 (*Belton*) [offering music services and television programming as a package without an option to buy music services alone "applied equally to sighted

6

and blind subscribers," was neutral on its face, and thus not actionable despite alleged disproportionate impact on blind people]; cf. *Hankins v. El Torito Restaurants* (1998) 63 Cal.App.4th 510, 518 [defendant's policy was not neutral where it allowed patrons who were not physically handicapped to use a restroom on the second floor but denied access for physically handicapped people to restroom on first floor].)

Plaintiff cites *Ruiz v. Musclewood Property Investments, LLC* (2018) 28 Cal.App.5th 15 for the proposition that a defendant's knowledge of accessibility barriers coupled with the defendant's lack of action to eliminate such barriers constitutes intentional discrimination. However, *Ruiz* involved a claim under the Disabled Persons Act, section 54 et seq. (the DPA) —not the Unruh Act—and the DPA does not require proof of intentional discrimination. (*Ruiz*, at p. 21; see § 54.3, subd. (a) [providing cause of action against "[a]ny person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities . . . or otherwise interferes with the rights of an individual with a disability"]; *Martinez, supra,* 81 Cal.App.5th at pp. 1037–1038.) Thus, the *Ruiz* court's observations about what facts may or may not support a finding of intentional discrimination are dicta and plainly inadequate to justify a departure from our Supreme Court's articulation of the intentional discrimination requirement under the Unruh Act. (See *Martinez,* at p. 1038 [noting "*Ruiz* does not even mention *Koebke* or the Unruh Civil Rights Act," and holding dictum in *Ruiz* is not persuasive insofar as it is "contrary" to *Koebke*].)[4]

---

[4] For similar reasons, the *Martinez* court determined *Martinez v. Adidas America, Inc.* (C.D.Cal. July 9, 2019,

We agree with *Martinez*—a defendant's mere failure to address known disparate effects of a policy is not alone sufficient to establish intentional discrimination under the Unruh Act. (*Martinez, supra,* 81 Cal.App.5th at p. 1038.)  The complaint's allegations are insufficient to state an Unruh Act claim on this basis.

**3.**     ***Webroot's Website Is Not a "Place of Public Accommodation" under Title III***

We now consider whether the complaint states a claim under the Unruh Act based on an alleged violation of the ADA, which does not require proof of intentional discrimination. (*Martinez, supra,* 81 Cal.App.5th at pp. 1038–1039, citing *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 673.) The dispositive issue is whether a standalone website with no connection to a physical location, like Webroot's website, constitutes a "place of public accommodation" under Title III. (42 U.S.C. § 12182(a).)  Like our colleagues in Division One, we conclude it does not. (*Martinez, supra,* 81 Cal.App.5th at p. 1053.)

---

No. EDCV 19-841 JGB (KKx)) 2019 WL 3002864 and *Thurston v. ClearPath Lending, Inc.* (C.D.Cal. Jan. 28, 2019, No. SACV 18-2094 JVS (JDEx)) 2019 WL 366405 were not persuasive authority, let alone sufficient to depart from our Supreme Court's clear pronouncement in *Koebke*.  (See *Martinez, supra*, 81 Cal.App.5th at p. 1038 [noting these cases are "not binding," they "assess federal question jurisdiction, and therefore deal only indirectly with the viability of a particular Unruh Civil Rights Act claim," and "neither of these cases analyzes the intent issue in any depth, and thus neither is helpful on this point"].)  We likewise are not persuaded by these federal district court cases.

8

a.    *The statutory text*

Title III "prohibits discrimination against disabled individuals by private entities." (*SDCCU, supra,* 50 Cal.App.5th at p. 1059.) It provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." (42 U.S.C. § 12182(a).) To establish a Title III violation, a plaintiff must show:  (1) a covered disability; (2) that "the defendant is a private entity that owns, leases, or operates a *place of public accommodation*; and (3) the plaintiff was denied public accommodations by the defendant because of [the] disability." (*Molski v. M.J. Cable, Inc.* (9th Cir. 2007) 481 F.3d 724, 730, italics added; accord, *SDCCU,* at p. 1060; *Martinez, supra,* 81 Cal.App.5th at p. 1039.)

"The ADA defines the phrase '. . . public accommodation' by enumerating 12 categories of covered 'places' and 'establishments,' giving nonexclusive examples of types of enterprises falling into each category." (*SDCCU, supra,* 50 Cal.App.5th at p. 1060, citing 42 U.S.C. § 12181(7)(A)–(L).) The listed examples mainly consist of unambiguously physical locations. (See, e.g., 42 U.S.C. § 12181(7)(A) [defining "public accommodations" as "private entities" that "affect commerce," including "an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor"]; accord, *SDCCU,* at p. 1060; *Martinez, supra,* 81 Cal.App.5th at p. 1040.)  "The implementing regulations

9

similarly define a public accommodation by referring to a 'facility,' which is in turn defined as 'all or any portion of buildings, structures, sites, complexes, equipment, rolling stock . . . or other real or personal property, including the site where the building, property, structure, or equipment is located.' " (*SDCCU,* at pp. 1060–1061, quoting 28 C.F.R. § 36.104 (2019).)

"A website is not identified in any of the statutory categories. This is not surprising as there were no commercial websites when the ADA was enacted in 1990. But in the 30 years since, websites have become central to American life. They are widely used by both consumers and businesses to communicate information and conduct transactions, and are now essential tools in conducting daily affairs. Thus, the issue whether websites are subject to ADA requirements has been the subject of a growing number of lawsuits, judicial attention, and academic commentary." (*SDCCU, supra,* 50 Cal.App.5th at p. 1061, fn. omitted; *Martinez, supra,* 81 Cal.App.5th at p. 1039.)

b. *The federal circuit court split*

The federal courts have reached "different conclusions" as to "whether a website is a public accommodation," expressing "two main views" on the issue. (*SDCCU, supra,* 50 Cal.App.5th at p. 1061.) "The different views stem primarily from the extent to which the court adheres to the express statutory language or whether it finds legislative history and intent to be paramount considerations." (*Ibid.*)

"One view (the minority view) is that websites are 'public accommodations' within the meaning of the ADA. This approach has been adopted by courts in the First, Second, and Seventh Circuits." (*SDCCU, supra,* 50 Cal.App.5th at p. 1062

[cataloguing cases].) For textual support, "[c]ourts adopting this view have relied on the 'service establishment[s]' category of the statutory definition, and particularly the fact that 'travel service' is contained in the illustrative list of these establishments ([42 U.S.C.] § 12181(7)(F) . . .), suggesting that Congress must have contemplated a public accommodation would 'include providers of services which do not require a person to physically enter an actual physical structure.' " (*Ibid.*; see, e.g., *Carparts Distribution Center v. Automotive Wholesaler's Assn.* (1st Cir. 1994) 37 F.3d 12, 19.) These courts, however, appear to be more persuaded by what they perceive to be Congress's necessary and logical intention to protect disabled individuals in all commercial transactions, regardless of where or how those transactions are conducted. Thus, the First Circuit observed in *Carparts* that "[i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result." (*Carparts,* at p. 19; see also *Morgan v. Joint Admin. Bd.* (7th Cir. 2001) 268 F.3d 456, 459 ["The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public."].)

"The second view (the majority view) is that websites are not 'public accommodations' under the ADA, *but* a denial of equal access to a website can support an ADA claim if the denial has prevented or impeded a disabled plaintiff from equal access to, or enjoyment of, the goods and services offered at the defendant's physical facilities. This view has been adopted by courts in the Third, Sixth, Ninth, and Eleventh Circuits." (*SDCCU, supra,* 50

Cal.App.5th at p. 1063 [cataloguing cases].) "The courts adopting this narrower statutory definition of a 'public accommodation' have relied on Congress's explicit listing of the type of places considered to be 'public accommodations,' and have emphasized that essentially all of these categories describe a physical location." (*Ibid.,* citing 42 U.S.C. § 12181(7)(A)–(L); see, e.g., *Parker v. Metro. Life Ins. Co.* (6th Cir. 1997) 121 F.3d 1006, 1010 (*Parker*) ["As is evident by [42 U.S.C.] § 12181(7), a public accommodation is a physical place."].)

"With respect to [Title III]'s identification of 'service establishment[s]' such as a 'travel service,' " courts adopting the majority view "have noted that under the statutory construction canon '*noscitur a sociis,*' a statutory term must be construed in the context of the accompanying words, thus supporting that a 'travel service' also identifies a physical place." (*SDCCU, supra,* 50 Cal.App.5th at p. 1063; see, e.g., *Parker, supra,* 121 F.3d at p. 1014 ["To interpret these terms as permitting a place of accommodation to constitute something other than a physical place is to ignore the text of the statute and the principle of *noscitur a sociis.*"]; *Ford v. Schering-Plough Corp.* (3d Cir. 1998) 145 F.3d 601, 614 (*Ford*); *Weyer v. Twentieth Century Fox Film Corp.* (9th Cir. 2000) 198 F.3d 1104, 1114 (*Weyer*).)

While the majority view seeks primarily to adhere to the statutory text, it also strives to give the broadest possible construction to Title III consistent with the ADA's remedial purpose. (See *SDCCU, supra,* 50 Cal.App.5th at p. 1064; see also *Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634, 642 (*Thurston*), citing *PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 676–677 (*PGA Tour*).) Courts embracing this view "recognize that a website can be important to providing access to a

12

defendant's public accommodation (physical premises) and to a disabled person's ability to use and enjoy services provided at those places." (*SDCCU,* at p. 1064.) Thus, "to the extent barriers on the website impinge[ ] on the plaintiff's ability to access such benefits at a physical premises," these courts hold a Title III "claim can be actionable under a nexus theory." (*Ibid.*; see, e.g., *Robles v. Domino's Pizza, LLC* (9th Cir. 2019) 913 F.3d 898, 905–906 (*Robles*) ["the ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants"]; *Weyer, supra,* 198 F.3d at p. 1114 [because the ADA covers only "actual, physical places where goods or services are open to the public, and places where the public gets those goods or services," there must be "some connection between the good or service complained of and an actual physical place"].) "The rationale underlying the adoption of this nexus standard mirrors many of the public policies discussed by the courts in adopting the broader view that all websites are directly subject to the ADA, e.g., that Congress would have intended this result given the growing importance of websites for consumers and businesses." (*SDCCU,* at p. 1064.)

> c.     *Martinez v. Cot'n Wash, Inc.*

In *Martinez,* our colleagues in Division One addressed an issue of first impression for our state courts in considering whether a standalone website, with no connection to a physical location where goods or services were offered to the public, constituted a place of public accommodation under Title III. (*Martinez, supra,* 81 Cal.App.5th at pp. 1034, 1039.)[5] Like

---

[5]     The *Martinez* court noted then-existing "California case law on this topic offer[ed] little guidance in navigating [the] federal circuit split." (*Martinez, supra,* 81 Cal.App.5th at p. 1041.)

plaintiff here, the plaintiff in *Martinez* sued the defendant under the Unruh Act, alleging the defendant failed to remove access barriers on its website that prevented blind individuals from making full use of the site through screen reading software. (*Id.* at p. 1034.)  After considering the federal circuit split, the statutory text, maxims of statutory construction, the ADA's remedial purpose, the legislative history, and relevant regulatory action (or inaction), the *Martinez* court concluded a standalone website does not constitute a place of public accommodation under Title III. (*Id.* at pp. 1039–1041, 1043–1053.)  In reaching

---

While at least "two California Courts of Appeal ha[d] applied the nexus analytical framework in assessing whether a website is a place of public accommodation," neither case "provided an occasion for the court to consider under what circumstances, if any, a standalone website" satisfies the requirement, because both courts "determined the requisite nexus existed." (*Ibid.*; see *Thurston, supra,* 39 Cal.App.5th at pp. 642–646 [affirming summary judgment in plaintiff's favor under nexus-based approach where website was incompatible with plaintiff's screen reading software and inhibited her ability to access defendant's physical restaurant]; *SDCCU, supra,* 50 Cal.App.5th at pp. 1053, 1070–1071 [reversing judgment of dismissal where website was incompatible with screen reading software and alleged defect denied plaintiff equal access to bank's physical locations]; see also *Belton*, *supra*, 151 Cal.App.4th at p. 1238 [affirming summary judgment for defendant cable provider against claim that television programing in basic cable tier was inaccessible to blind people; holding, "to state a claim under the ADA, plaintiffs must show that they have been denied access to *a place of public accommodation* and, as a matter of law, cable services are not such a place"].)

this conclusion, the *Martinez* court rejected many of the same arguments plaintiff makes in this appeal.

    d.      *Plaintiff's textual arguments*

Like the plaintiff in *Martinez*, plaintiff argues Webroot's website satisfies the "place of public accommodation" requirement under the plain language of Title III. Citing *Robles* and *Thurston*, plaintiff emphasizes the statutory text refers to services " '*of* any place of public accommodation' as opposed to 'at' or 'in' " a place of public accommodation. (Italics added; see *Robles, supra,* 913 F.3d at p. 905; *Thurston, supra,* 39 Cal.App.5th at p. 642.) It is true that the *Robles* and *Thurston* courts highlighted this distinction; however, they did so to support their adoption of the *nexus approach*, which, as we have discussed, requires that a website have some connection to the services of a *physical* place of public accommodation to support a Title III action. (See, e.g., *Thurston,* at pp. 642, 644.) As the *Robles* court explained, the ADA requirement to provide auxiliary aids "applies to [defendant's] website and app, even though customers predominantly access them away from the *physical restaurant*: 'The statute applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation. . . .' [¶] The alleged inaccessibility of [defendant's] website and app impedes access to the goods and services *of its physical pizza franchises*—which are places of public accommodation." (*Robles,* at p. 905, first and last italics added; see *Thurston,* at p. 642, quoting *Robles*.)

The nexus requirement recognized in *Robles* and *Thurston* is consistent with "the plain meaning of the term 'place,' " which "the United States Supreme Court has recently noted . . . connotes a *physical* space." (*Martinez, supra,* 81 Cal.App.5th

15

at p. 1044, citing *Boy Scouts of America v. Dale* (2000) 530 U.S. 640, 657, italics added.) As the *Martinez* court explained in rejecting an argument much like the one plaintiff advances here, "[d]ictionaries 'overwhelmingly' define 'place' as involving a physical location. [Citation.] Neither Title III nor any implementing regulations provide a different definition of the word for the purposes of Title III. Nor does the state of technology when the ADA was passed in 1990 suggest that Congress was unaware that the term carried a connotation of physical space and thus could exclude certain 'sales and retail establishments' from the scope of Title III based on a lack of connection to a physical space. '[T]here were countless . . . businesses operating outside of brick-and-mortar premises in 1990, including some that had been in operation for decades,' such as mail order catalogs. [Citation.] Congress's decision to nevertheless use the phrase 'place,' the plain meaning of which involves physical space, could easily be understood as an intentional exclusion of businesses without any physical presence from the scope of Title III." (*Martinez*, at pp. 1044–1045.) We agree with the *Martinez* court. Both "the plain meaning" of the word " 'place,' " and "its meaning considered in historical context," refute plaintiff's construction of the statutory text.[6] (*Id.* at p. 1045.)

_____

[6] Plaintiff suggests this analysis is somehow at odds with the construction of the term "place" in *Carolyn v. Orange Park Community Assn.* (2009) 177 Cal.App.4th 1090. We disagree. The issue in *Carolyn* was whether a "series of recreational trails" on portions of a private homeowner's association's " 'common area' " constituted a place of *public* accommodation under Title III. (*Carolyn*, at pp. 1093, 1104.) The *Carolyn* court concluded they were not because the homeowner's association

The term "facility" as defined in the ADA's implementing regulations likewise refutes plaintiff's proposed construction. As discussed, federal regulations define "place of public accommodation" as "a *facility* operated by a private entity whose operations affect commerce and fall within at least one of" the 12 categories listed in Title III. (28 C.F.R. § 36.104 (2022), italics added.) These regulations in turn define "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." (*Ibid*.) Plaintiff argues a website qualifies as " 'personal property' " and therefore constitutes a "facility" under Title III. We disagree. As the *Martinez* court explained in rejecting an identical argument, "[t]he term 'other . . . personal property' appears at the end of a list of *exclusively physical spaces* and, as to 'equipment' or other 'personal property,' presupposes the existence of a 'site where the . . . property . . . is located.' " (*Martinez, supra,* 81 Cal.App.5th at p. 1046, quoting 28 C.F.R. § 36.104 (2022), italics added.) "Under the principles of *noscitur a sociis* and *expressio unius est exclusio alterius*," because a

"actively excluded the general public from using the trails." (*Id.* at p. 1104.) In reaching that conclusion, the court naturally focused on the "public" aspect of "places of public accommodation," without concerning itself with whether such places must be physical locations, as the trails plainly were. (See *ibid*. ["Each of the examples listed in the ADA and the Health and Safety Code illustrates the broader concept that places of public accommodation are places designed and intended to provide services, goods, privileges, and advantages *to members of the public*." (Italics added, fn. omitted.)].)

website is not a physical space like the other items listed in the regulation, it "cannot constitute a 'facility' and thus, cannot constitute a 'place of public accommodation' " under Title III. (*Martinez,* at p. 1046; see *Henderson v. Mann Theatres Corp.* (1976) 65 Cal.App.3d 397, 403 ["[T]he expression of certain things in a statute necessarily involves exclusion of other things not expressed—*expressio unius est exclusio alterius*."].)

  e. *Plaintiff's policy arguments*

 Apart from the foregoing textual arguments, plaintiff contends we must interpret the terms "place of public accommodation" and "facility" to include Webroot's standalone website because, to do otherwise, would (1) defy the edict to interpret the ADA liberally to achieve its remedial purpose; (2) produce absurd results; and (3) contradict positions taken by the Department of Justice (DOJ)—the regulatory agency charged with implementing the ADA—in amicus briefs and other informal guidance the agency has produced over the past 20 years.[7]  None of these arguments is persuasive.

---

[7] "DOJ is charged with issuing regulations concerning the implementation of the ADA." (*Robles, supra,* 913 F.3d at p. 903, fn. 2, citing 42 U.S.C. § 12186(b) ["[T]he Attorney General shall issue regulations in an accessible format to carry out the provisions of this subchapter."]; *Bragdon v. Abbott* (1998) 524 U.S. 624, 646 [DOJ is "the agency directed by Congress to issue implementing regulations, [citation], to render technical assistance explaining the responsibilities of covered individuals and institutions, [citation], and to enforce Title III in court"].)

 Plaintiff requests we take judicial notice of several amicus briefs and other DOJ-related documents, including a DOJ consent decree and recent guidance issued on the agency's official government website.  We grant the request. (See Evid. Code, §§ 459, subd. (a), 452, subds. (c) & (d) [authorizing judicial notice

18

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." (*PGA Tour*, *supra*, 532 U.S. at pp. 674–675.) Consistent with that purpose, Title III seeks " ' "to bring individuals with disabilities into the economic and social mainstream of American life . . . in a clear, balanced, and reasonable manner" ' and [to] afford 'people with disabilities . . . equal access to the array of goods and services offered by private establishments and made available to those who do not have disabilities.' " (*Martinez, supra,* 81 Cal.App.5th at p. 1047, citing *PGA Tour,* at pp. 674–675; accord, *Thurston, supra,* 39 Cal.App.5th at pp. 642–643.) To achieve this end, Congress not only concluded "there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals" (*PGA Tour,* at p. 675), but it also "intend[ed] that the types of accommodation and services provided to individuals with disabilities, under all of the titles of [the ADA], should keep pace with the rapidly changing technology of the times." (H.R. Rep. No. 101-485, 2d Sess., p. 108 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 303, 391.)

---

of "[o]fficial acts of the . . . executive . . . departments of the United States" and "[r]ecords of . . . any court of record of the United States"]; *People v. Morales* (2018) 25 Cal.App.5th 502, 511, fn. 7 ["courts may take judicial notice of information published on official government websites"].) Plaintiff also requests we take judicial notice of motions and orders filed in the *Martinez* case. We will grant that request as well; however, these records have limited relevance to the issues in this appeal. (See Evid. Code, § 452, subd. (c) [authorizing judicial notice of records of any court of this state].)

Plaintiff contends the ADA's remedial purpose and Congress's aim to formulate the legislation in a way that would keep pace with changing technology mandate that we interpret the term "place of public accommodation" to include standalone websites with no nexus to a physical location where goods or services are offered to the public. We do not disagree with the premise that lessening barriers disabled individuals face in accessing electronic commerce would be consistent with the general, overall goal of Title III. But acknowledging this coherence does not give a court license to expand the statute's reach into areas that the statutory text—even broadly construed—plainly does not touch. The Ninth Circuit cogently made this point in *Weyer* to explain why the statutory text and canons of statutory construction required some connection to a *physical* place of public accommodation where the defendant offered its goods or services:

> "Title III provides an extensive list of 'public accommodations' in [42 U.S.C.] § 12181(7), including such a wide variety of things as an inn, a restaurant, a theater, an auditorium, a bakery, a laundromat, a depot, a museum, a zoo, a nursery, a day care center, and a gymnasium. All the items on this list, however, have something in common. *They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services.* The principle of *noscitur a sociis* requires that the term, 'place of public accommodation,' be interpreted within the context of the accompanying words, and

> this context suggests that some connection
> between the good or service complained of
> and an actual physical place is required."

(*Weyer, supra,* 198 F.3d at p. 1114, first italics added; see also *Ford, supra,* 145 F.3d at p. 614 ["the doctrine of *noscitur a sociis*" directs that terms "should be interpreted by reference to the accompanying words of the statute 'to avoid the giving of unintended breadth to the Acts of Congress' "].)

The *Martinez* court likewise recognized that "the mandate to interpret [the statutory] language broadly, and in a manner that takes into account changes in technology," is not "a blanket authorization to require anything that would achieve the ADA's overall goal of equal access." (*Martinez, supra,* 81 Cal.App.5th at p. 1048.) "[T]he law inherently involves a balancing of benefits and burdens to different stakeholders" (*ibid.*), and a "statute may provide a partial remedy for what Congress perceives as a social problem because the proponents are compelled to compromise with others who think a broader statute would be a worse social problem" (*Weyer, supra,* 198 F.3d at p. 1112). Because "Congress chose specific language," and the statutory text is not susceptible of an interpretation that "includ[es] digital websites," the *Martinez* court determined it could not "rely entirely on the broad goals of the statute" to sanction a Title III action with no connection to a *physical* place of public accommodation. (*Martinez,* at p. 1048.) We agree with this analysis. (See also *Thurston, supra,* 39 Cal.App.5th at p. 644 ["We hold that including websites connected to a physical place of public accommodation is not only consistent with the plain language of Title III, but it is also consistent with Congress's mandate

21

that the ADA keep pace with changing technology to effectuate the intent of the statute."].)

For similar reasons we are not persuaded that requiring a connection to the goods or services of a physical place of public accommodation inevitably frustrates the manifest purposes of Title III or leads to absurd results that Congress could not have intended. (Cf. *In re Ge M.* (1991) 226 Cal.App.3d 1519, 1523.) As the *Martinez* court explained, "[b]ecause brick and mortar stores conduct business differently than do retail websites, the type and extent of the burdens antidiscrimination measures impose on a business will necessarily differ depending on whether the business is operating through a physical storefront or a purely digital one." (*Martinez, supra,* 81 Cal.App.5th at p. 1047.) Given the "different burden-benefit calculus," Congress could have reasonably determined that Title III should address "only physical retailers," while leaving "the question of how to properly balance the benefits and burdens of imposing similar requirements on purely digital retailers" for future legislative action after appropriate factfinding. (*Martinez*, at p. 1047; see also *id.* at p. 1051.)

Plaintiff suggests this analysis is flawed because, in plaintiff's telling, "Congress has already struck a balance by providing safeguards (inuring to the benefit of public accommodations) for all ADA claims predicated upon the absence of auxiliary aids and services in 42 U.S.C. § 12182(b)(2)(A)(iii)." (Boldface omitted.) It is not clear what plaintiff means by "inuring to the benefit of public accommodations" or what relevance he believes the cited section has to the question of whether a standalone website constitutes a place of public accommodation. Section 12182(b)(2)(A) of title 42 of the

22

United States Code defines the conduct that constitutes "Discrimination" under Title III and includes "the absence of auxiliary aids." (42 U.S.C., § 12182(b)(2)(A)(iii).) Because auxiliary aids must be provided at physical locations under the ADA, the fact that their absence can be the basis for a Title III claim does nothing to establish that a standalone website may also constitute a place of public accommodation. (See, e.g., *Ariz. ex rel. Goddard v. Harkins Amusement* (9th Cir. 2010) 603 F.3d 666, 668 (*Goddard*) ["closed captioning and audio descriptions are correctly classified as 'auxiliary aids and services' that a movie theater may be required to provide under the ADA"].)

Finally, plaintiff commits a substantial portion of his opening brief to summarizing (or quoting at length) amicus briefs, settlement agreements, and consent decrees the DOJ has filed in connection with Title III litigation over the past 20 years. He contends this informal guidance from the regulatory agency charged with enforcing the ADA "irrefutably confirms" there need be "no 'nexus'" between a business's website and its physical location to establish a Title III violation. We disagree.

While the United States Supreme Court has instructed courts to afford substantial deference to *formal* agency interpretations and adjudications, "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." (*Christensen v. Harris County* (2000) 529 U.S. 576, 587; see *Chevron, U.S.A., Inc. v Natural Resources Defense* (1984) 467 U.S. 837, 842–845 [holding a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute].) Rather, informal agency

23

interpretations—like those proffered by plaintiff here—are " 'entitled to respect' . . . , but only to the extent that those interpretations have the 'power to persuade.' " (*Christensen*, at p. 587; see *Reno v. Koray* (1995) 515 U.S. 50, 61 [internal agency guideline, which is not " 'subject to the rigors of the Administrative Procedure Act, including public notice and comment,' " are entitled only to "some deference"].) As for litigation briefs, the high court has "declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.' " (*Bowen v. Georgetown Univ. Hosp.* (1988) 488 U.S. 204, 212 (*Bowen*); see also *id.* at p. 213 ["Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."]; *Matz v. Household Intern. Tax Reduction Inv. Plan* (7th Cir. 2001) 265 F.3d 572, 574 ["the IRS' position in the amicus brief was an informal agency policy pronouncement not entitled to *Chevron* deference"].)

Our Supreme Court has similarly instructed that courts must "independently judge the text of the statute" in question and, while "an agency's interpretation is one among several tools available to the court," it is "not binding or necessarily even authoritative." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8.) "The deference due an agency interpretation . . . turns on a legally informed, commonsense assessment of [its] contextual merit" and " 'will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with

24

earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (*Id.* at pp. 14–15, italics omitted.)

The DOJ "has previously endorsed the applicability of Title III to ' "Web sites of public accommodations," ' but has not provided specific regulatory guidance." (*SDCCU, supra,* 50 Cal.App.5th at p. 1061, citing *Robles, supra,* 913 F.3d at pp. 903, 906–907, 910.) In 2010, the DOJ issued an "Advance Notice of Proposed Rulemaking" on web accessibility to clarify private entities' " 'obligations to make . . . Web sites accessible.' " (*Robles,* at p. 903; *SDCCU,* at p. 1061, fn. 5.) However, in 2017, the agency withdrew its proposed website rule. (*Robles,* at p. 910.) In explaining the withdrawal, the DOJ stated it " 'continue[s] to assess whether specific technical standards are necessary and appropriate to assist covered entities with complying with the ADA.' " (*Id.* at p. 909, italics omitted; *SDCCU,* at p. 1061, fn. 5.)

The *Martinez* court recently addressed what to make of DOJ and congressional inaction regarding "confusion in the [federal] courts" over whether a standalone website should be considered a " 'place of public accommodation' " under Title III. (*Martinez, supra,* 81 Cal.App.5th at p. 1049.) The court noted that as early as 2000, and later again in 2006, Congress held hearings to consider " 'the new significance of the Internet economy to recent economic growth, the costs that application of the ADA would impose on that rapidly expanding segment of the economy, and the substantial First Amendment implications of applying the ADA to private Internet web sites and services.' " (*Ibid.*, quoting H.R. Rep. No. 106-1048, 2d Sess., p. 275 (2001); see also *Martinez,* at p. 1049, citing Hearing before House Com.

25

on Judiciary, Subcom. on Constitution, 109th Cong., 2d Sess., at pp. 924–925 (Sept. 13, 2006).) These hearings included testimony from the DOJ that " 'the ADA's accessibility requirements do apply to private Internet web sites and services.' " (*Martinez*, at p. 1049.) However, when Congress amended the ADA in 2008, it clarified only a *different* section of the statute and "took no similar legislative action to clarify 'place of public accommodation.' "[8] (*Martinez*, at pp. 1049–1050.) In 2010, a congressional committee expressly acknowledged the need for clarification "and called upon the DOJ to act." (*Id.* at p. 1050, citing Hearing before House Com. on Judiciary, Subcom. on Constitution, Civil Rights and Civil Liberties, 111th Cong., 2d Sess., at p. 2 (Apr. 22, 2010).) Yet, despite that request, the DOJ chose "not to exercise its rulemaking power" and, instead, "continues to file amicus curiae briefs" and issue

[8] Plaintiff contends the addition of "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments" to the definition of "Auxiliary aids and services" (42 U.S.C., § 12103(1)(B)) in the 2008 amendment demonstrates Congress's intention to include standalone websites as places of public accommodation under the ADA. (See Pub.L. No. 110-325 (Sept. 25, 2008) 122 Stat. 3553.) As we have already noted, this auxiliary aids argument is wholly unconvincing because such aids, including those to make visually delivered materials available to individuals with visual impairments, must be provided at *physical* locations under the ADA. (See, e.g., *Goddard, supra,* 603 F.3d at p. 670 [at a movie theater "audio descriptions clearly are auxiliary aids and services"; "audio descriptions are 'effective methods of making [. . . visually] delivered materials available to individuals with [. . . visual] impairments' "].)

informal guidance that is "ambiguous as to whether a brick and mortar presence is necessary for a website to constitute a 'place of public accommodation.' " (*Martinez,* at pp. 1050–1051, citing U.S. Dept. of Justice, *Guidance on Web Accessibility, and the ADA* (Mar. 18, 2022) <http:beta.ada.gov/resources/ web-guidance> [as of July 29, 2022], boldface omitted.)

The *Martinez* court found the "only conclusion" to draw from this failure to act was that neither Congress nor the DOJ "officially endorses" the view that a standalone website is a place of public accommodation under Title III. (*Martinez, supra,* 81 Cal.App.5th at p. 1051.) The court explained: "Congress's failure to provide clarification in the face of known confusion—and, to a lesser extent, the DOJ's similar failure—is not a reason for us to step in and provide that clarification. To the contrary, it is a reason for us *not* to do so. This is particularly true, given that providing clarification in the manner [the plaintiff] requests could have sweeping effects far beyond this case, *none of which has been the subject of legislative factfinding*." (*Ibid*., second italics added.) As for the informal DOJ guidance that plaintiff relies upon here, the *Martinez* court similarly concluded "such nonbinding and case-specific pronouncements of the DOJ do not provide a basis for us to do what Congress (and, for that matter, the DOJ itself) has apparently made a conscious choice not to do. . . . [U]nlike an amicus curiae brief, our interpretation of the ADA will affect cases other than the one before us."[9] (*Id*. at p. 1052; accord, *Bowen, supra,* 488 U.S. at pp. 212–213.)

---

[9] Plaintiff argues the *Martinez* court invoked a " 'particularly weak barometer of legislative intent' " by focusing on Congress's failure to amend the ADA. (See *Koebke, supra,* 36 Cal.4th at p. 849.) The argument misreads *Martinez.* As we have

We agree with the foregoing analysis and, like the *Martinez* court, find the statutory text and maxims of statutory construction compel the conclusion that Webroot's standalone website "is not a 'place of public accommodation' under Title III as currently written," notwithstanding the DOJ's informal guidance to the contrary. (*Martinez, supra,* 81 Cal.App.5th at p. 1053.) The trial court properly dismissed plaintiff's action.

_____

explained, the *Martinez* court found the plain meaning of the term "place" in the statutory text and the definition of the term "facility" in the ADA's implementing regulation both suggested "an intentional exclusion of businesses without any physical presence from the scope of Title III." (*Martinez, supra,* 81 Cal.App.5th at pp. 1044–1045.) Contrary to plaintiff's insinuation, the *Martinez* court did not invoke Congress's failure to act as a basis for discerning legislative intent; rather, the court "ultimately conclude[d] that *the language of the statute*, when considered in the context of Congress's failure to act and the DOJ's silence in terms of formal guidance," would "not permit [the court] to adopt an interpretation of the statute *that is not dictated by its language*, especially in the face of the legislative and agency inaction described above." (*Id.* at p. 1052, italics added.) It was the text of the statute that dictated the result in *Martinez*—not extrinsic legislative or regulatory inaction.

## DISPOSITION

The judgment is affirmed.  Defendant Webroot, Inc. is entitled to costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


NGUYEN, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

29